IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No. 32274-2-III |
| DAMIAN A. SCHWARZ, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| SUSAN M. SCHWARZ, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Susan Champagne appeals the property distribution ordered upon the dissolution of her marriage to Damian Schwarz. She challenges the trial court's characterization and distribution of several of her and Mr. Schwarz's retirement and other investment accounts. The character of the accounts is complicated by the fact that both parties entered their 13-year marriage with substantial separate assets, whose character was arguably transformed by contributions, transfers, and reinvestment during the course of the marriage.

The appeal requires us to address several tracing issues and, most significantly, to decide what constitutes clear and convincing evidence that investments that were demonstrably separate property at their inception remained so, where the party arguing their separate character offers less than exhaustive documentation of their status during the course of the marriage. We hold that here, as in other cases, evidence can be clear and convincing without being irrefutable.

We affirm one of the trial court's challenged characterizations but, with the advantage of a transcribed report of proceedings and issues that have been narrowed, we conclude that the court abused its discretion in finding that Ms. Champagne failed to overcome the community property presumption with respect to three others. We reverse the characterization of the three assets and remand for the trial court to revisit its division of assets with the corrected characterizations in mind.

## FACTS AND PROCEDURAL BACKGROUND

Damian Schwarz and Susan Champagne were married for 13 years before separating and filing this dissolution action in 2012. Both had been married before, and they entered the marriage with separate assets. Mr. Schwarz entered the marriage with a house, an individual retirement account (IRA), and as the owner and operator of a small business. Ms. Champagne entered the marriage with substantial investments acquired through her own earnings and an inheritance from her mother.

Both parties intended in this second marriage to keep their assets and finances

separate. In response to questioning from Ms. Champagne's attorney, Mr. Schwarz

explained:

> Q. Sir, are you aware of any community funds ever being deposited into [Ms. Champagne's] Bank of America account?
> A. I have no idea what she did with her accounts.
> Q. What she did with what?
> A. Whatever account she had, *I don't know what she had. I don't know what she did with that. That was our agreement that that—whatever is—that was her deal.*

Report of Proceedings (RP) at 137 (emphasis added). When cross-examined, Ms.

Champagne agreed that the parties did not discuss their separate property:

> Q. And you also testified that he never talked with you about his separate investments or assets; is that correct?
> A. That's correct.

RP at 344.

The way that the couple sought to accomplish a separation of their finances was

primarily by dividing household bills. While faithfully dividing household bills for 13

years, they evidently did not appreciate the value of retaining complete records or the

importance of scrupulously segregating their community earnings from their separate

assets.

Shortly after marriage, Ms. Champagne closed the existing savings account she

maintained as "Susan Champagne," in which she held approximately $47,900, and

opened a new account. The parties now dispute whether this account and successor

3

accounts were opened in both parties' names and were community accounts, or whether the key accounts remained separate and were merely payable on death to Mr. Schwarz. Ms. Champagne liquidated and transferred other premarital assets, including inherited assets, into this and other accounts. While she presented documentary evidence that could support the initially separate character of assets she consolidated in the early 2000's, Mr. Schwarz challenges the sufficiency of her initial documentation in a couple of instances and her documentation of all of her assets thereafter. During the marriage, both parties made contributions to preexisting IRAs; they now dispute in some instances whether those contributions were made with community funds and, in other instances, whether the trial court was presented with sufficient evidence from which to apportion the accounts as part separate and part community.

By the time of trial, the parties had resolved the relatively insignificant property division issues arising out of their marriage; at issue were the major assets. The parties' lawyers both exhibited a command of the 13 years' worth of financial evidence and presented it efficiently—perhaps too efficiently, given the number of assets involved, for any judge to track contemporaneously. At the conclusion of the trial, the court asked the lawyers to submit their closing arguments in writing and to focus on tracking separate assets, explaining to their clients that while he had done "hundreds of these cases," their dissolution was "one of the most complex tracing cases I think I've ever had." RP at 378.

4

Mr. Schwarz claimed to have demonstrated the separate character of $404,693 in separate assets, principal among them being his separate business, most of the value of his retirement accounts, and his home, in which the parties lived until separating in June 2012. The court found the entire $404,693 in value of assets to be Mr. Schwarz's separate assets.

Ms. Champagne claims to have demonstrated the separate character of $184,198 in separate assets, principal among them being bank and investment accounts held in her individual name. The court found only $48,928 in value of these assets to be Ms. Champagne's separate assets.

The court characterized $292,403 of the parties' assets as community property and distributed $184,450.51 of those assets to Ms. Champagne and $107,952.50 to Mr. Schwarz. In order to give effect to the equal division of community assets, the court ordered Ms. Champagne to make an equalization payment of $38,249 to Mr. Schwarz.

Findings and conclusions were presented and entered based on the memorandum decision. A motion for reconsideration filed by Ms. Champagne was denied. Ms. Champagne appeals.

## ANALYSIS

Ms. Champagne has assigned error to the trial court's findings and conclusions dealing with only four assets:

- The characterization of <u>an IRA held in Mr. Schwarz's name at Charles Schwab</u>, whose value at the time of dissolution was found to be <u>$185,271</u>; the court treated $159,189 in value of the property as Mr. Schwarz's separate property and the $26,082 balance as community property;

- The characterization of <u>an IRA held in Ms. Champagne's former married name at Western National Life</u>, whose value at the time of dissolution was found to be <u>$15,869</u>; the court held that Ms. Champagne had failed to overcome the presumption that it was community property;

- The characterization of <u>an IRA held in Ms. Champagne's former married name at Bank of America</u>, whose value at the time of dissolution was found to be <u>$4,401</u>; the court again held that Ms. Champagne had failed to overcome the presumption that it was community property; and

- The characterization of <u>an investment account in Ms. Champagne's former married name at D.A. Davidson</u>, whose value at the time of dissolution was found to be <u>$115,000</u>; the court treated the assets in the account as hopelessly commingled and thereby community property.

Ms. Champagne also assigns error to the court's order that she make a $38,249 equalization payment, contending both that it was based on an erroneous characterization of the foregoing assets and that it was not just and equitable. She also contends that the trial court abused its discretion in denying her motion for reconsideration.

After outlining the applicable law, we first address the challenged characterization of Mr. Schwarz's IRA. We then summarize Ms. Champagne's evidence offered to trace nine originally separate assets to assets held at the end of the marriage, before turning to

6

the three remaining assets whose characterization she challenges, the equalization

payment, and the motion for reconsideration.

## I. APPLICABLE LAW

In a dissolution action, all property, both community and separate, is before the

court for distribution. *Friedlander v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208

(1972). An asset is separate property if "acquired before marriage; acquired during

marriage by gift or inheritance; acquired during marriage with the traceable proceeds of

separate property; or, in the case of earnings or accumulations, acquired during

permanent separation." *In re Marriage of White*, 105 Wn. App. 545, 550, 20 P.3d 481

(2001) (footnotes omitted); RCW 26.16.010.

The character of property, whether separate or community, is determined at the

time of acquisition. *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 865, 855 P.2d

1210 (1993). Property *acquired* during marriage is presumptively community property.

A party may rebut this presumption by offering clear and convincing evidence that the

property was acquired with separate funds. *In re Marriage of Skarbek*, 100 Wn. App.

444, 449, 997 P.2d 447 (2000). "The requirement of clear and satisfactory evidence[1] is

---

[1] "[V]arious phrasings" of the standard for overcoming the presumptions applied in community property disputes have been used in Washington cases over the years, as our Supreme Court acknowledged in *In re Estate of Borghi*, 167 Wn.2d 480, 484 n.4, 219 P.3d 932 (2009). The court took the opportunity in *Borghi* to "make clear that, once a presumption in favor of either community or separate property is established, the burden to overcome the presumption is by clear and convincing evidence." *Id.*

not met by the mere self-serving declaration of the spouse claiming the property in question that he acquired it from separate funds and a showing that separate funds were available for that purpose." *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950). "Separate funds used for such a purpose should be traced with some degree of particularity." *Id.*

A presumption that an asset *possessed* by a married person is community property may arise even though the particular time of acquisition has not been established. Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 WASH. L. REV. 13, 29 (1986) (citing *State ex rel. Marshall v. Superior Court*, 119 Wash. 631, 206 P. 362 (1922)). Property *in the possession* of a married person is presumed to be community property "'until the contrary is shown;'" this presumption "is not a very strong presumption and is one that may be easily overcome." *Marshall*, 119 Wash. at 637 (quoting 5 RULING CASE LAW *Community Property* § 26, at 844 (1914)). Although this presumption will always yield to a preponderance of the evidence, the duration of the marriage may affect whether the trial court should apply it at all. "As a general rule, the longer the duration of the marriage the more likely the court will assume that assets in the possession of the spouses are community." 19 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 10.4 at 137 (1997).

"Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to

8

transmute the property from separate to community property." *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). It will retain that character as long as it can be traced or identified. *Pearson-Maines*, 70 Wn. App. at 865 (citing *Baker v. Baker*, 80 Wn.2d 736, 745, 498 P.2d 315 (1972)).

"Commingling" of separate and community funds may give rise to a presumption that all are community property. This is not commingling in the ordinary sense, however[2]; it must be hopeless commingling. Unlike the foregoing presumptions, this one is conclusive, arising only after the effort at tracing proves impossible.[3] It is "[o]nly if community and separate funds are so commingled that they may not be distinguished or apportioned is the entire amount rendered community property." *Pearson-Maines*, 70 Wn. App. at 866 (citing *In re Estate of Allen*, 54 Wn.2d 616, 622, 343 P.2d 867 (1959)).

---

[2] "Commingle" is defined as:

to mingle or mix together . . . **1** : to mix together . . . **2** : to combine (the funds or property of several individuals) into a common fund or stock (as for convenience of investment by a trust company) **syn** *see* MIX

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 457 (1993).

[3] Rather than an evidentiary rule, this presumption is a provision of substantive law. *See In re Green's Estate*, 46 Wn.2d 637, 642, 283 P.2d 989 (1955) ("The so-called 'conclusive presumption' is . . . a provision of substantive law"). In *In re Witte's Estate*, for instance, our Supreme Court did not speak of a presumption but explained instead: "Where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, *is* community property." 21 Wn.2d 112, 125, 150 P.2d 595 (1944) (emphasis added).

9

"If the sources of the deposits can be traced and identified, the separate identity of the funds is preserved." *Skarbek*, 100 Wn. App. at 448.

Commingling in this hopeless sense is illustrated by *Witte's Estate* and *In re Marriage of Shui v. Rose*, 132 Wn. App. 568, 125 P.3d 180 (2005). In *Witte's Estate*, farm income was found to have been commingled where, for much of a 44-year marriage, it was part separate (from the separate character of the farm ground) and part community (from community effort) and

> there was never any segregation as between the two items, and . . . the entire amount was continuously devoted as a whole to the acquisition of other lands which were treated in the same manner, and . . . it is now impossible to disentangle, separate, or apportion the component parts of the mass.

21 Wn.2d at 128.

In *Shui v. Rose*, stock options were exercised by the husband, the shares thus acquired were sold, and the proceeds were deposited to a single account. The options had different inherent values at the time of exercise and "some . . . had a mixed character, some were entirely community property, and some were entirely separate property." 132 Wn. App. at 583. The single account was later divided into four investment accounts, with the division being unrelated to the character of the original options. The court concluded that "the funds in the investment accounts simply are not traceable to the options that yielded them." *Id.* at 585.

10

A trial court is not bound to award property to the individual or the community based on the property's classification but "the court must have in mind the correct character and status of the property as community or separate before any theory of division is ordered." *Blood v. Blood*, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966) (citing *Shaffer v. Shaffer*, 43 Wn.2d 629, 262 P.2d 763 (1953)).

A trial court's characterization of property as separate or community presents a mixed question of law and fact. *In re Marriage of Kile and Kendall*, 186 Wn. App. 864, 876, 347 P.3d 894 (2015) (citing *In re Marriage of Martin*, 32 Wn. App. 92, 94, 645 P.2d 1148 (1982)). "'The time of acquisition, the method of acquisition, and the intent of the donor, for example, are questions for the trier of fact.'" *Id.* (quoting *Martin*, 32 Wn. App. at 94). Accordingly, whether or not a rebuttable presumption of community or separate character is overcome is a question of fact. *See id.* at 881 (reviewing whether substantial evidence supports overcoming the presumption); *In re Marriage of Mix*, 14 Cal.3d 604, 612, 536 P.2d 479, 122 Cal. Rptr. 79 (1975). We review the factual findings supporting the trial court's characterization for substantial evidence. *Kile*, 186 Wn. App. at 876 (citing *In re Marriage of Mueller*, 140 Wn. App. 498, 504, 167 P.3d 568 (2007)). The ultimate characterization of the property as community or separate is a question of law that we review de novo. *Id.*

If a trial court mischaracterizes property, we will remand the matter for further consideration when "(1) the trial court's reasoning indicates that its division was

11

significantly influenced by its characterization of the property, and (2) it is not clear that

had the court properly characterized the property, it would have divided it in the same

way." *In re Marriage of Shannon*, 55 Wn. App. 137, 142, 777 P.2d 8 (1989).

## II. MR. SCHWARZ'S CHARLES SCHWAB IRA

Mr. Schwarz's evidence on the character of his Charles Schwab IRA account

number []5129 consisted of two account statements (April 2003 and January 2007), tax

documentation of his contributions to the account in 2006, 2007, 2010, and 2011, and his

testimony that the account was established before the parties' marriage in 1999 and there

had been only the four documented post-marriage contributions. He testified that the

April 2003 statement "was the last statement I could get from Charles Schwab." RP at

141.[4]

Mr. Schwarz admitted that contributions to the account between 2006 and 2011

were made with community funds. He therefore offered the testimony of a certified

public accountant, Todd Carlson, who had reviewed IRS tax statements for 2006, 2007,

2010, and 2011 that reported the amounts of the annual contributions and the year-end

values of the account. Based on the year-to-year percentage of the account comprising

community funds and year-to-year growth, Mr. Carlson expressed the opinion that at

---

[4] When testifying, Mr. Schwarz mistakenly referred to the earliest statement as the March 2003 statement. The earliest statement in Ex. P-19, about which he was testifying, is the monthly statement for April 2003.

year-end 2011 and thereafter, 85.9 percent of the account represented the value of

separate contributions and 14.1 percent represented the value of community

contributions. On that basis, $159,189 of the stipulated trial value of the account

($185,271.44) represented the present value of Mr. Schwarz's separate contributions and

$26,082 represented the present value of community contributions. The trial court

accepted Mr. Schwarz's evidence and Mr. Carlson's analysis and characterized

$159,189.44 in value of the IRA as Mr. Schwarz's separate property.

Ms. Champagne argues that the trial court erred in treating Mr. Schwarz's

evidence as sufficient. The earliest documentation of the IRA that Mr. Carlson had

reviewed was the 2006 IRS tax form, and he was asked to assume that before 2006 the

entire account was Mr. Schwarz's separate property and that the only community

contributions occurred in 2006, 2007, 2010, and 2011. Ms. Champagne argues that only

Mr. Schwarz's self-serving testimony supports his position that the Charles Schwab IRA

existed before the marriage and that no other community contributions were made.

Citing *Berol*, she argues that his "mere self-serving declaration" is insufficient. Br. of

Appellant at 26 (quoting *Berol*, 37 Wn.2d at 382).

Applying the analysis required by case law, the evidence established that Mr.

Schwarz *possessed* the assets in the Charles Schwab IRA in and before April 2003 but

13

there was no evidence that he *acquired* those assets during the marriage.[5] At most, then, the weak presumption that property possessed during marriage is community property applies to the IRA assets before community contributions were made beginning in 2006. *Berol*, which dealt with property shown to have been acquired during the marriage, does not apply. Because Mr. Schwarz entered the parties' marriage less than four years before the April 2003 date of the earliest Charles Schwab IRA statement admitted as evidence and he was in his mid-40s at the time, the presumption is particularly weak.

Mr. Schwarz's testimony that the Charles Schwab IRA existed before marriage is sufficient evidence of its initially separate character. Mr. Carlson's testimony provided a sufficient basis for apportioning its value at dissolution into community and separate shares. The trial court did not err in its characterization of the asset.

### III. MS. CHAMPAGNE'S ALLEGEDLY SEPARATE ASSETS

The overarching issue presented by Ms. Champagne's challenge to the characterization of the remaining three assets—assets that the court characterized as community property and that Ms. Champagne claims are entirely or predominantly her separate property—is how exhaustive a party's tracing of her separate assets must be.

---

[5] While Ms. Champagne did not concede that the Charles Schwab IRA predated the marriage, she testified she was aware of the four contributions for which tax records were offered, explaining that the parties had historically made IRA contributions at tax time, in order to reduce their federal income tax liability. As Mr. Schwarz points out, Ms. Champagne had the ability to acquire copies of all of the parties' joint tax returns.

Ms. Champagne testified and in almost all cases presented supporting documentary evidence that she had over $195,000 in value in separate, liquid, assets at the time of the parties' marriage. She testified that her separate assets were maintained during the 13 years of the marriage either in her individual stock accounts or individual savings-type accounts that—while sometimes linked with checking accounts into which her paychecks were deposited—were nonetheless separate from admittedly community property checking accounts. She moved her assets between banks and brokerage firms and at trial she testified to the transitions from one account to another, providing documentation of these transitions. What she did *not* do is provide an exhaustive 13-year tracing of every account.

We conclude that Ms. Champagne's evidence was largely sufficient to overcome the community property presumption and that the trial court abused its discretion in finding otherwise. We begin by recapping the nine separate assets that predated the parties' marriage and Ms. Champagne's evidence in support of their separate character. Because the extent and quality of her supporting evidence is at issue, we cite heavily to the evidence. For ease of reading, we do so by footnote from this point on.

*$49,719.35 in savings at Washington Mutual Bank.* Ms. Champagne presented a monthly statement (September 1999) for an indexed money market account number

[]3690 maintained in her individual name with Washington Mutual Bank.[6] (Like the parties and the court, we often refer to Washington Mutual Bank hereafter as "WaMu," its trade name.) The statement shows a premarital account balance of $49,719.35 on August 26, 1999.[7] She presented an October 1999 statement showing a name change to the WaMu account, to her married name.[8] That October statement and another October statement for a new WaMu savings account number []7792, document a transfer of all funds in account number []3690 to account number []7792.[9]

Ms. Champagne testified that during the parties' marriage, her earnings were not deposited to her savings-type or stock brokerage accounts, but were deposited instead to distinguishable checking accounts. She presented a monthly statement (October 1999) for her WaMu "Free Checking" account number []8994, that reveals payroll deposits from her employer and substantial check writing activity.[10]

Ms. Champagne testified that in June 2002 she opened new accounts at WaMu that she referred to as her "platinum account," her "checking account," her "statement savings account," and later, to obtain better interest, her "money market savings

---

[6] Ex. R-120, at 1.

[7] *Id.*

[8] Ex. R-120, at 2.

[9] Ex. R-120, at 3.

[10] Ex. R-122.

account."[11] WaMu statements admitted into evidence document the closing of her savings account number []7792 and the transfer of the $62,316.58 balance in that account to her new Platinum Account number []7113.[12] Among the exhibits at trial were statements for the new accounts titled "YOUR COMBINED STATEMENT OF ACCOUNTS," that identified her accounts as follows:

| Product Name | Account Number |
| --- | --- |
| Free Checking | []8994 |
| Platinum Checking | []7113 |
| Statement Savings | []1343 |
| Money Market Savings | []5960[13] |

Ms. Champagne testified to some large transfers between her Platinum Account and a preexisting D.A. Davidson account number []6087 between August 2000 and February 2001. She testified that in or about August 2000, she met with her broker at D.A. Davidson, who recommended she sell certain investments and purchase others.[14] She explained that based on his recommendations, she transferred $56,000 from her WaMu savings to D.A. Davidson to make the recommended purchases with the understanding that other stocks would be sold "in a few months," after which anticipated

---

[11] RP at 247, 249, 252.

[12] Ex. R-120, at 13-14.

[13] *E.g.*, Ex. R-115, at 1 (Aug. 2008), 5 (Sept. 2008).

[14] RP at 363, 239-40.

proceeds of some $10,000 and $16,000 would "go back into my savings account to replenish a portion of the $56,000 that I took out."[15]

Ms. Champagne supported her testimony with a copy of her September 2000 statement for her WaMu account showing a $56,000 telephone transfer on August 22 and her August 2000 D.A. Davidson statement showing the purchase of $55,582 in new investment positions on August 21 and the $56,000 deposit on August 23.[16] She also provided copies of her January 2001 and February 2001 D.A. Davidson statements showing withdrawals of $10,000 and $16,369.47, respectively, that she testified were deposited to her WaMu savings account.[17] She did not provide statements showing the deposit of the $10,000 and $16,349.47 back into her savings account, explaining when cross-examined that "I do not have the specific account statement that shows the actual deposits," but that "I produced account statements that, during the period of time, the account statements increased in that value."[18] In this connection, the evidence includes her November 2000 WaMu savings statement showing an ending balance of almost $30,000 and a June 2002 statement showing an opening balance of $62,253.[19]

---

[15] RP at 363-64.

[16] Ex. R-120, at 8; Ex. R-121, at 9.

[17] Ex. R-120, at 10-11.

[18] RP at 341.

[19] Ex. R-120, at 9, 13.

Ms. Champagne testified that upon WaMu's demise in September 2008 she closed all of her accounts with that bank and opened new accounts with Bank of America.[20] She supported her testimony with the September 2008 monthly statements for both the WaMu and Bank of America accounts, reflecting the contemporaneous delivery and receipt of identical balances.[21]

It was undisputed at trial that Ms. Champagne's Bank of America accounts were still open, and were claimed by her as separate assets. The trial court concluded that Ms. Champagne had "successfully traced by clear and convincing evidence that these accounts were and are comprised of funds that were [Ms. Champagne's] separate property prior to marriage and have not otherwise been co[m]mingled."[22]

*$45,181 in value in A.G. Edwards & Sons account.* Ms. Champagne testified that before the parties' marriage, she maintained a substantial investment account at A.G. Edwards & Sons.[23] She supported her testimony with a premarital quarterly statement (April-June 1999) for an account number []1014 maintained in her individual name with A.G. Edwards.[24] The statement shows the account held $509.90 in cash and four mutual

---

[20] RP at 255.

[21] Ex. R-115, at 5-14.

[22] Clerk's Papers (CP) at 101.

[23] RP at 299.

[24] Ex. R-121, at 1-2.

funds with a quarter-end value of $44,670.69.[25] It also shows the account was set up for automatic reinvestment of dividends paid by the mutual funds. Ms. Champagne testified that she closed the account shortly after the parties' marriage and transferred the mutual funds to D.A. Davidson account number []6087, which she opened at that time. She supported her testimony with the March 2000 statement for the D.A. Davidson account, which reveals $502.97 in cash, positions in the same four mutual funds formerly held at A.G. Edwards, and that the new account was also set up for reinvestment of dividends from the mutual funds.[26] The number of shares in each mutual fund in the D.A. Davidson account had increased slightly from the number of shares held at A.G. Edwards eight months earlier, in varying amounts—from a negligible increase to an increase of approximately 12 percent. It was undisputed at trial that Ms. Champagne's D.A. Davidson account number []6087 was still open, and was claimed by her as a separate asset.

*$39,192.10 inheritance from mother's estate.* Ms. Champagne testified that she inherited several assets from her mother, who died before the parties' marriage. She testified that one was a distribution of cash she received in December 1999.[27] She supported her testimony with an undated statement of "Individual Balances" that she

---

[25] *Id.*

[26] Ex. R-121, at 4-6.

[27] RP at 225-26.

explained was prepared by her sister, the executor of her mother's estate.[28] The statement included a calculation of the net amount due each of five individuals (herself and her siblings, according to Ms. Champagne), showing each child's beginning share of cash ("average value") of $40,217.65 and adjustments for the value of "Household Items" and any "advance" that each had evidently received.[29] "Sue's Balance" was identified as $39,192.10. She also presented the January 2000 statement for her WaMu savings account []7792 showing a "Customer Deposit" of $39,112.10 on December 29, 1999, next to which was her handwritten notation, "M & D house & estate."[30] She testified that she made the notation at the time she received the monthly statement.[31] As earlier addressed, funds from WaMu account number []7792 were transferred to WaMu account number []7113 and from there, were transferred to her Bank of America account.

*$15,000 loan to Damian Schwarz repaid with Charles Schwab investments.* Ms. Champagne testified that before the parties were married, Mr. Schwarz had borrowed $15,000 from her that he repaid in May 2004 by transferring assets from his own account with Charles Schwab into her name.[32] She supported her testimony with a May 2004

---

[28] RP at 336; Ex. R-120, at 4.

[29] *Id.*

[30] Ex. R-120, at 5.

[31] RP at 219-20; Ex. R-120, at 5.

[32] RP at 309-10.

21

statement for a Charles Schwab account number []9712 in her name that reflected the journaling into the account of 17 stock and mutual fund positions on May 28, 2004.[33] The month-end value of the account was $15,591.84.[34] Mr. Schwarz admitted at trial that the investments in the Charles Schwab account totaling $15,591.84 were originally his and that he transferred the investments to Ms. Champagne's name in 2004.[35] When cross-examined about the loan Mr. Schwarz did not deny that he borrowed the money but claimed not to remember the circumstances, testifying "I could have," and "Not like it's not true, but I don't recall."[36]

Ms. Champagne testified that assets in the Charles Schwab account were transferred into her D.A. Davidson account number []6087 in May 2012. She supported her testimony with the May 2012 statement for her D.A. Davidson account showing receipt into the account on May 9, 2012, of seven securities positions and debit and credit balances characterized as NSCC[37] transfers or receipts "from deliv firm."[38] She also produced a copy of the March 2012 statement for her Charles Schwab account number []9712 showing exactly the same seven stock positions that were received into the D.A.

---

[33] Ex. R-121, at 12.

[34] Ex. R-121, at 11.

[35] RP at 138.

[36] RP at 137-38.

[37] National Securities Clearing Corporation.

[38] Ex. R-121, at 321-33.

22

Davidson account some five weeks later.[39] The cash balance in her Charles Schwab deposit account at the end of March had been $1,779.88 and the credit balance received at D.A. Davidson five weeks later was $1,819.90.[40]

*$10,902 in value of Cabletron stock.* Before the parties' marriage, Ms. Champagne worked for Cabletron. She testified that one employee benefit was participation in an employee stock purchase plan through which she acquired 736 shares of Cabletron stock.[41] Her testimony was supported by documentation that as of June 1999, three months before the parties' marriage, she owned 736 shares of Cabletron stock.[42] Her October 1999 statement for the plan showed that the 736 shares had a market value at that time of $10,902.37.[43]

Ms. Champagne testified that in the summer of 2000 she sold 482 shares of her Cabletron stock through E-Trade.[44] Her testimony was supported by trade confirmations and a monthly statement for her E-Trade account number []0005, in her name, showing that 482 shares were sold in transactions taking place on June 28 and July 6.[45] She

---

[39] *Compare* Ex. R-121, at 25-27, *with* Ex. R-121, at 30-33.

[40] *Compare* Ex. R-121, at 24, *with* Ex. R-121, at 32.

[41] RP at 292-93.

[42] Ex. R-116, at 1.

[43] *Id.*

[44] RP at 294-95.

[45] Ex. R-116, at 2-4.

explained that the proceeds from the sale were kept in her E-Trade account until March 2001 when she used the proceeds to purchase 500 shares of Cisco stock.[46] She presented a March 2001 statement for her E-Trade account number []0005 showing the purchase on March 30 of 500 Cisco shares.[47]

Ms. Champagne testified she eventually transferred the assets held in her E-Trade account to the Charles Schwab account that had been established in 2004, when Mr. Schwarz repaid the previously described $15,000 loan. While she supported her testimony with account transfer documentation showing the transfer of 500 Cisco shares into her Charles Schwab account number []9712, the account number for the transferred E-Trade account—[]1059—differed from the account number on E-Trade statements for earlier periods.[48] No explanation was offered. As earlier recounted, the assets in Ms. Champagne's Charles Schwab account number []9712 were all transferred in May 2012 into an account number []6087 that she maintained with D.A. Davidson.

*$8,136.77 cash value of New York Life whole life policy.* Ms. Champagne presented a January 20, 2000 "Explanation of Benefits . . . in Full Settlement of All Claims Under Policy Number []861[,] Insured Susan Marie Champagne."[49] It was dated

---

[46] RP at 295.

[47] Ex. R-116, at 5-8.

[48] *Compare* Ex. R-121, at 15, 17, *with* Ex. R-116, at 2-8

[49] Ex. R-120, at 6 (some capitalization omitted); RP at 226-27.

January 20, 2000, and indicated an "Amount Payable" in settlement of the cash value of the policy of $8,136.77.[50] Ms. Champagne testified that the whole life policy dated back to her prior marriage.[51] She testified that the proceeds from cashing out the policy were deposited to her WaMu savings account.[52] Her testimony was supported by her February monthly statement for her savings account number []7792 showing the deposit of $8,136.77 on February 22.[53]

*$8,073.96 in value of IDS bond funds.* Ms. Champagne testified that she inherited two IDS (income deposit security) bond funds from her mother's estate that were distributed to her in 1998 with values of $2,328.48 and $3,783.04, respectively.[54] She offered, and the trial court admitted, an exhibit R-131 that is not in our record on appeal. According to testimony that was not challenged, the exhibit included March 1998 statements for IDS stock and bond funds, in Ms. Champagne's name, having the values to which she testified.[55] Ms. Champagne also presented the July 2000 statement for her WaMu checking account number []8994, showing a deposit on July 5 of $8,073.96, that

---

[50] *Id.*

[51] RP at 226-27.

[52] RP at 227-28.

[53] Ex. R-120, at 7.

[54] RP at 236-37.

[55] RP at 236-37 (citing Ex. R-131, at 3-4).

she testified represented the proceeds of her sales of both IDS funds.[56] She claimed the funds had increased in value over the prior two-plus years.[57] According to the testimony, the exhibit also reflects a transfer from the checking account to her savings account the next day, but in the amount of $10,000 rather than $8,073.96.[58] Ms. Champagne testified that her transfer of the $10,000 included the proceeds of her sale of the IDS funds. She admitted that the balance of approximately $1,900 came from her earnings and was community property.[59]

*$6,399 in value of mutual funds at WM Financial Services.* Ms. Champagne testified that before the parties' marriage, she had received a distribution of a mutual fund from her mother's estate that she held at WM Financial Services.[60] She supported her testimony with a March 1999 account statement for account number []9513 in her individual name, showing holdings of 107.441 shares of Fidelity Contrafund with a month-end value of $6,399.18.[61] She testified that she rolled the fund into her D.A. Davidson account number []6087.[62] She supported that testimony with the March 2000

---

[56] RP at 234-35 (citing Ex. R-131, at 2).

[57] RP at 238.

[58] RP at 235-36.

[59] RP at 338.

[60] RP at 306.

[61] Ex. R-121, at 3.

[62] RP at 307-08.

statement for the D.A. Davidson account, showing 129.167 shares of Fidelity Contrafund held in the account as of month-end.[63] She explained that the difference in the number of shares was because she had elected dividend reinvestment and that the "107.441 shares on March 31, '99 [were] all reflected in the Contrafund, 129.157 shares in March of 2000."[64] Her testimony that she had elected dividend reinvestment was supported by the March 2000 D.A. Davidson statement, which revealed that 3.1550 shares of the fund had been received in an NSCC transfer on March 22, implying that a dividend reinvestment of 3.1550 shares had been received at, and transferred by, the firm in which the shares were formerly held.[65]

*$5,770 in value of IRA assets at WaMu.* Ms. Champagne testified that before the parties' marriage she had contributed to an IRA that she held at WaMu.[66] She supported her testimony with account statements demonstrating that at the time of her marriage to Mr. Schwarz, she had an IRA maintained at WaMu with a date of marriage value of approximately $5,770.[67] She offered statements showing that on April 8, 2008, she closed the IRA and used funds to purchase an annuity, Policy No. []4692, that she held in

---

[63] Ex. R-121, at 5.

[64] RP at 308.

[65] Ex. R-121, at 6.

[66] RP at 266.

[67] Ex. R-119, at 2.

an IRA at AIG (Annuity Insurance Company).[68] She offered an account statement

showing that as of April 2010, she held her "Policy No. []4692[,] Issue Date: 4/08/2008"

in an IRA at Western National Life Insurance Company, which she testified was the

result of a name change.[69] She presented statements showing that, at the time of trial, the

annuity policy in her Western National IRA had a value of $15,869. Mr. Schwarz has

never disputed that the origin of the Western National IRA was the separate property

WaMu IRA.[70]

Mr. Schwarz disputes the character of contributions that Ms. Champagne made to

the IRA in April 2005 and April 2007. Ms. Champagne testified she did not have enough

money in her checking account from her earnings to make the contributions to her IRA,

so she relied instead on funds from her separate Platinum savings account.[71] She

supported her testimony with statements from her WaMu Platinum account, pointing out

on cross-examination that funds were transferred from her savings account on both

occasions in order to make the contribution.[72]

---

[68] RP at 270; Ex. R-119, at 13-17.

[69] RP at 273; Ex. R-119, at 18.

[70] Ex. R-105.

[71] RP at 346-47.

[72] *Id.*; Ex. R-119, at 3-4 (showing $3,000 withdrawal from Platinum account and corresponding contribution on 4/15); *id.* at 8-9 (showing $4,000 withdrawal from Platinum account and corresponding IRA contribution for tax year 2006).

In summary, Ms. Champagne testified to nine assets that she demonstrated predated the parties' marriage. She testified to how some of those assets came to repose, by the time of the dissolution action, in the Western National IRA, Bank of America IRA, and D.A. Davidson account whose characterization as community property she challenges on appeal. In addition to her testimony, she offered positive documentary evidence of the transfer and reinvestment of the assets.

Mr. Schwarz responds with three arguments in support of the court's characterization of the three assets as community property. He argues, first, that deposits to the IRAs and stock brokerage account came in some instances from an allegedly community property "account [number []7113] held in both parties' names at [WaMu,]" Br. of Resp't at 12; that deposits came in some instances from an allegedly community property "account [number []7792] . . . at Washington Mutual Savings Bank," *id.* at 15; and that the assets in the D.A. Davidson account were commingled and cannot be apportioned. *Id.* at 18-24. We address Mr. Schwarz's arguments in the context of each of the three assets whose characterization Ms. Champagne challenges.

A. Ms. Champagne's Western National IRA

As previously discussed, Ms. Champagne offered her testimony and account statements demonstrating that at the time of her marriage to Mr. Schwarz, she had an IRA maintained at WaMu with a date of marriage value of approximately $5,770, which she eventually rolled over into an annuity policy that she held first at AIG and later at

Western National. Mr. Schwarz has never disputed that the origin of the Western

National IRA was the separate property WaMu IRA. He does dispute the character of the

$3,000 and $4,000 contributions that Ms. Champagne made to the IRA in April 2005 and

April 2007, while it was still at WaMu.

Mr. Schwarz first argues on appeal that the WaMu accounts were in both parties'

names and characterizes them as joint. When cross-examined, Ms. Champagne was

asked about who owned the accounts and testified as follows:

> Q. . . . I noticed that, at the Washington Mutual Account, R-120,
> that in October of 1999, that was transferred into a joint account?
> A. No. That's not a joint account.
> Q. So R-120, let's go to R-120, and let's go to page 3.[73]

Page 3 of Ex. R-120, which Ms. Champagne was asked to review, was the October 1999

opening statement for the WaMu account in Ms. Champagne's new, married, name and

includes the following in the upper left hand corner:

> SUSAN MARIE SCHWARZ
> DAMIAN A SCHWARZ
> 2904 WEST RIVERVIEW DR
> SPOKANE WA 99205

The Riverview Drive address is that of Mr. Schwarz's home, where the parties lived

during the marriage.

The cross-examination continued:

---

[73] RP at 334-35.

Q. . . . Do you see that there please?

A. I do.

Q. Is your husband on that account?

A. He's on that account as a payable on death beneficiary. I'm the one that set up the account. I have never made any of my accounts a joint account with my husband.

Q. So in terms of how this account is held, what we have here is the upper, left-hand corner, your name and his name. Do you have any evidence in the record that establishes that this is not a joint account?

A. Yes. If you look at the middle of the statement, it's only in my name, Susan Marie Schwarz. The upper left-hand name is an addressee on the account statement.[74]

We insert the information in the middle of the statement on page 3 of Ex. R-120 to which Ms. Champagne pointed (the account number has been reduced to its last four digits):

| GUARANTEED GREAT RATE | WASHINGTON MUTUAL BANK | | FDIC INSURED |
|---|---|---|---|
| SUSAN MARIE SCHWARZ | | ACCOUNT NUMBER: | 779-2 |

OVERDRAFT LIMIT 100.00
SUBJECT TO A PER ITEM OVERDRAFT TRANSACTION CHARGE

| BEGINNING BALANCE | TOTAL WITHDRAWALS | TOTAL DEPOSITS | ENDING BALANCE |
|---|---|---|---|
| .00 | .00 | 48,008.68 | 48,008.68 |

Ms. Schwarz conceded at the 2013 trial that she did not produce documents showing how the account had been opened 14 years earlier, testifying, "I don't believe I have those records. I opened the account myself."[75]

---

[74] RP at 335.

[75] *Id.*

Ms. Champagne's exhibits included copies of dozens of checks drawn on her WaMu checking account and numerous monthly statement copies for that and other WaMu accounts.[76] The account holder reflected on all of the checks is "Susan M. Schwarz."[77] WaMu's monthly "COMBINED STATEMENT OF ACCOUNTS" in evidence are all addressed solely to "Susan Marie Schwarz."[78] "Detail Information" for her individual accounts refer in most instances to "SUSAN MARIE SCHWARZ TR FOR DAMIAN A SCHWARZ."[79] When she opened accounts with Bank of America in September 2008 upon WaMu's demise, her bank account statements for that account were addressed to "SUSAN M SCHWARZ, POD DAMIAN A SCHWARZ."[80]

It is only the earliest statements for the WaMu savings account, covering periods from October 1999 through June 2002, that are *addressed* to "Susan Marie Schwarz, Damian A Schwarz," but, as Ms. Champagne pointed out in cross-examination, each identifies the account, by account number, as the account of "Susan Marie Schwarz."[81]

---

[76] Ex. R-115, at 1-8, 13; Ex. R-119, at 4-7, 9-12; R-120, at 1-3, 5, 7-9,13-14; R-122; R-123; R-102, at 1-6.

[77] *See* Exs. R-102, at 1-6, *and* R-115, at 13.

[78] Ex. R-115, at 1 (Aug. 2008), 5 (Sept. 2008); R-119, at 6 (Apr. 2005), 10 (Apr. 2007).

[79] *E.g.*, Ex. R-115, at 2-3, 6-7, *but cf.* Ex. R-115, at 4, 8 ("Money Market Savings Detail Information" referring to only "Susan Marie Schwarz").

[80] *E.g.*, Ex. R-115, at 9, 10, 14; Ex. R-118, at 1.

[81] Ex. R-120, at 3, 5, 7-9.

Since Ms. Champagne demonstrated the separate character of her premarital WaMu savings account, a presumption arises "that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." *Borghi*, 167 Wn.2d at 484. Even if Mr. Schwarz had demonstrated that Ms. Champagne opened and maintained joint bank accounts after they married, "[t]he separate or community character of property is not determined by the title name under which it is held." *Id.*, 167 Wn.2d at 492 (Madsen, J., concurring). Mr. Schwarz did not testify to any understanding that Ms. Champagne had ever added him to her bank accounts; his consistent testimony was that the parties intended to keep their accounts separate. His lawyer's argument that Ms. Champagne's WaMu accounts were joint rests entirely on the fact that the address on the account statements included both parties for a time and that some accounts later bore indications that Ms. Champagne had identified her husband as a beneficiary.

This was not enough to demonstrate that Ms. Champagne ever opened a joint account or intended to transmute her separate WaMu account into community property. The trial court's memorandum decision includes no finding that any such transmutation was intended or occurred. Because the trial court did not find that the WaMu accounts were joint accounts at any time, we do not consider this argument further.

Mr. Schwarz also suggests that the accounts became community accounts through commingling. Ms. Champagne testified that she deposited her paychecks to the Free

33

Checking account and kept her separate property in the linked savings account.[82] The

account statements in evidence support her testimony. The exhibits include checking

account statements from 2005, 2007 and 2008, all of which show the deposit of her

"TRICOM" and "WELLS ST JOHN" paychecks into the Free Checking Account.[83]

They reveal that all checks were written from the Free Checking Account, whose ending

balances were in the hundreds or several thousands of dollars, while the ending balances

of her Platinum or Money Market Savings accounts were in the tens of thousands of

dollars.[84] The documentary evidence provides consistent support (albeit not 13 years'

worth of exhaustive monthly support) for Ms. Champagne's testimony that while the

several WaMu accounts were linked, her wages were deposited into the Free Checking

Account and her separate property was maintained in the Platinum Checking Account.[85]

The trial court's memorandum decision does not address whether Ms.

Champagne's Platinum and Money Market Savings Accounts at WaMu were separate or

community. It does, however, address the character of the Bank of America accounts

into which she transferred the funds she had held until 2008 at WaMu. As earlier

observed, the trial court concluded, "the Court is fully satisfied that the wife successfully

---

[82] RP at 337-38.

[83] Ex. R-119, at 7, 11; Ex. R-115, at 2, 6.

[84] Ex. R-119, at 6, 10; Ex. R-115, at 1-4.

[85] *See* Ex. R-119, at 4-12; *see* RP at 346-47.

34

traced by clear and convincing evidence that these accounts were and are comprised of funds that were the Respondent's separate property prior to marriage and have not otherwise been commingled."[86] On that basis, the court awarded both Bank of America accounts to Ms. Champagne.

Ms. Champagne argues that it follows necessarily from the trial court's characterization of the Bank of America accounts that she adequately traced her savings before marriage into her several savings-type accounts at WaMu. We agree. While Mr. Schwarz argues that the WaMu and Bank of America accounts "were two different accounts and, of course, there was a substantial lapse of time between the contributions and the characterization of these Bank of America accounts as her separate property at the time of trial," Br. of Resp't at 13, we cannot ignore the fact that the trial court did not speak to the WaMu accounts at all. The court's silence as to the WaMu accounts implies that it viewed Ms. Champagne's undertaking to trace her savings through the entire marriage as a singular undertaking, culminating with Bank of America accounts that the court found to be separate. In evaluating the character of the remaining disputed assets, then, we treat Ms. Champagne's savings-type accounts as her separate property.

Nonetheless, despite its characterization of the Bank of America accounts as separate, the trial court characterized her Western National IRA, which originated before

---

[86] CP at 101.

35

marriage and had been contributed to thereafter only with funds from Ms. Champagne's savings, as community property. Its memorandum decision characterized the testimony offered on the Western National IRA as "[c]onvoluted and confusing" and found that Ms. Champagne had failed to rebut the community property presumption.[87] Elsewhere, the court lamented that "[m]*uch* of the testimony at trial" was convoluted and confusing, and that the petitioner and respondent "provided the Court with almost none of the tools necessary to resolve" many of the complex issues.[88]

"A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons, i.e., if the court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *State v. Hudson*, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009). It appears likely that the trial court's mistake in characterizing the Western National IRA as community property was a result of the sheer volume of evidence on numerous assets presented during the two-day bench trial. Notably, while the trial court's memorandum decision questioned Mr. Schwarz's credibility on at least one issue (an issue not raised in this appeal) it never questioned Ms. Champagne's credibility.

---

[87] CP at 103.

[88] CP at 99-100 (emphasis added).

With the advantage of a transcribed record and a substantial narrowing of issues, we can see that Ms. Champagne's evidence tracing this IRA, while presented amidst an extraordinary amount of evidence addressing other issues, was not convoluted or confusing, and that it was sufficient. The court abused its discretion in finding that Ms. Champagne failed to rebut the community property presumption and in characterizing the Western National IRA as community property.

B. Ms. Champagne's Bank of America IRA

In April 2010, Ms. Champagne opened a new IRA at the Bank of America.[89] Funds to make the contribution were drawn from her Bank of America Select Money Market Savings Account No. []2732.[90] As earlier detailed, Ms. Champagne's Bank of America accounts were opened in September 2008 with funds from her WaMu accounts. The savings account balance had grown to $31,113.21 by the time she used $4,200 to fund the Bank of America IRA.[91]

Ms. Champagne's Bank of America savings account is one of the accounts that the trial court was "fully satisfied" had been "successfully traced."[92] While the trial court characterized the Bank of America IRA as community property based on a conclusory

---

[89] Ex. R-118, at 2.

[90] Ex. R-118, at 1-2.

[91] Ex. R-118, at 1.

[92] CP at 101.

ruling that Ms. Champagne never "conclusively demonstrated"[93] its separate character, we are satisfied that because the IRA was demonstrably funded from a separate property account, this is another instance in which the trial court was simply buried in a surfeit of detail on dozens of issues. With simplified issues and a transcript of the trial, we can see that Ms. Champagne's evidence was sufficient and that the trial court abused its discretion in characterizing the Bank of America IRA as community property.

## VI. D.A. DAVIDSON INVESTMENT ACCOUNT

Ms. Champagne's third challenge is to the trial court's characterization of her D.A. Davidson account as community property. Ms. Champagne offered evidence tracing the assets in this account to eight sources, each of which she contends was her separate property: her WM Financial Services account; her A.G. Edwards account; her WaMu savings, last held in her Platinum account (and that included the proceeds of her New York Life policy, the $39,192 cash distribution from her mother's estate, and her IDS bond funds); and her Charles Schwab account (that included the proceeds of her Cabletron shares). Each of the consolidations other than the Charles Schwab consolidation took place in or before August 2000—within the first year of her marriage. But Mr. Schwarz argues that community and separate assets were commingled in the

---

[93] CP at 104.

D.A. Davidson account, with the result that all of the assets are conclusively presumed community property.

If Ms. Champagne demonstrated the separate character of the eight contributory assets, then they would retain their separate character as long as they could be traced or identified. *Pearson-Maines*, 70 Wn. App. at 865. Again, it is only if community and separate funds are so commingled that they may not be distinguished or apportioned is the entire amount rendered community property. *Id.* at 866. In those instances that Ms. Champagne acquired new assets during the marriage, she was required to overcome the community property presumption by offering clear and convincing evidence that the new asset was acquired with separate funds. *Skarbek*, 100 Wn. App. at 449. Acquiring new assets does not include being credited with interest or dividends (stock or otherwise), since the "rents, issues and profits" of separate property are inherently separate property. RCW 26.16.010.

Proof by clear and convincing evidence denotes a quantum or degree of proof greater than a mere preponderance of the evidence, but something less than proof beyond a reasonable doubt. *Matter of Demming*, 108 Wn.2d 82, 109, 736 P.2d 639 (1987). Evidence clearly and convincingly establishes a proposition if it makes the proposition "'highly probable.'" *Dalton v. State*, 130 Wn. App. 653, 666, 124 P.3d 305 (2005) (quoting *In re Marriage of Schweitzer*, 132 Wn.2d 318, 329, 937 P.2d 1062 (1997)). Ordinarily, the testimony of a single credible witness can qualify as clear and convincing

evidence, even if the witness's testimony is contradicted by other witnesses. *See id.* at 667 (holding that a single witness's testimony, contradicted by others but credited by the trial court, satisfied the standard). But as earlier noted, overcoming the community property presumption requires more than the "mere self-serving declaration" of a spouse that she acquired an asset with separate funds and that separate funds were available. *Berol*, 37 Wn.2d at 382. This makes sense, since in most cases the source of funds used for a purchase is not the sort of fact that even an honest person would reliably recall years later. It is reasonable to require the party's testimony to be supported by, e.g., documentary evidence, an admission by their party-opponent, or the testimony of another witness.

Here, Ms. Champagne presented evidence that five of the eight assets that eventually ended up (or whose proceeds ended up) in the D.A. Davidson account were acquired before the parties were married. Her exhibits include statements showing her premarital ownership of the WaMu savings account, the A.G. Edwards account, the WM Financial account, the IDS bond funds, and the Cabletron stock. Mr. Schwarz did not challenge the separate character of those initial assets.

Ms. Champagne produced an estate distribution summary to support her testimony that one of the assets acquired after the marriage—the $39,192 cash distribution she received in December 1999—was an inheritance, and thereby separate property. Mr. Schwarz claimed to have received an inheritance of his own during the marriage, and the

40

trial court accepted its characterization as separate property where Mr. Schwarz supported his testimony with a closing statement.[94] The estate distribution summary offered in evidence by Ms. Champagne is somewhat informal but not atypical of a family settlement of an uncontested estate.

The evidence showed that Ms. Champagne *possessed* another of the assets, the New York Life policy, during the marriage, but there was no evidence that she *acquired* the whole life policy after marrying Mr. Schwarz in September 1999. As with Mr. Schwarz's Charles Schwab IRA, then, only the weak presumption that property possessed during marriage applies to the policy, a presumption that is overcome by a preponderance of the evidence. And as with Mr. Schwarz's IRA, the fact that she possessed the property early in the parties' marriage—a mere four months into the marriage—makes the presumption particularly weak.

In the case of Mr. Schwarz's IRA, we recognized that his testimony alone was sufficient to overcome this weak presumption. Here, the explanation of benefits that Ms. Champagne offered as evidence provided additional circumstantial evidence supporting her testimony that she acquired the policy well before the parties' marriage: it identified "Elements that Comprise the Cash Value Settlement" as including a several thousand dollar "Value of Paid Up Additional Insurance," a couple thousand dollar "Value of Opp

---

[94] RP at 78-79; CP at 104.

Paid-Up Additions", and a policy loan.[95] Mr. Schwarz offered no evidence challenging the separate character of the policy.

Finally, if we look beyond the premarital $15,000 loan and analyze the Charles Schwab account opened in May 2004 to repay the loan as an asset acquired during the marriage, Ms. Champagne's testimony that it was acquired in repayment of a separate property loan is supported by Mr. Schwarz's admissions. He admitted that the initial securities in the account were all ones that he transferred to her at that time.[96] He also testified, when asked if he had borrowed $15,000 from Ms. Champagne, "I don't recall, to be honest. Not like it's not true, but I don't recall."[97] Collectively, her testimony, the monthly statement, and Mr. Schwarz's admissions would be sufficient to overcome the community property presumption.

In the case of each of the eight assets, then, we conclude that Ms. Champagne's evidence, if believed by the trial court, was sufficient to establish their initially separate character. The trial court's memorandum decision and its eventual findings do not identify any of Ms. Champagne's evidence that it found untrustworthy.

Turning to the requirement that assets be traced to retain their separate character, we hold that Ms. Champagne's burden was not to provide an exhaustive accounting. In

---

[95] Ex. R-120, at 6 (some capitalization omitted).

[96] RP at 138.

[97] *Id.*

*Skarbek*, 100 Wn. App. at 449-50, this court observed that the husband in that case overcame the presumption that funds in a joint account were community property by "exhaustively documenting the details of the bank account activity" to the satisfaction of the trial judge, but we merely affirmed in that case that the husband's evidence was sufficient, not that exhaustive documentation is necessary. The Skarbeks' marriage had lasted only three years, and the activity documented by Mr. Skarbek was all quite recent. In a longer-term marriage where relevant financial activity took place many years earlier, it is unrealistic to require exhaustive documentation, and, in a case like this, unhelpful. "Exhaustive" documentation of the many accounts and assets involved in this case would have been overwhelming. Only a small part would be important.

Instead, the requirement that assets be traced required Ms. Champagne to demonstrate by clear and convincing evidence that any acquisition of "new" assets she claimed as separate was with the proceeds of separate assets. In almost all cases, Ms. Champagne met this burden.

Ms. Champagne acknowledged that she failed to retain and was unable to produce in discovery or provide the court with exhaustive statements of her accounts before their ultimate consolidation into the D.A. Davidson account. But in this respect, she was on no different footing than Mr. Schwarz. He was unable to produce statements for his Charles Schwab IRA account number []5129 for periods before April 2003, explaining that despite exercising "due diligence," he had been "unable to secure these out-of-date

43

records from the custodian."[98] In support of his testimony that the IRA was his separate property, he offered only two statements—his statements for April 2003 and January 2007.[99]

Ms. Champagne's burden of tracing did not require her to provide exhaustive records showing every deposit and withdrawal into the multiple bank and stock brokerage accounts. The standard of "clear and convincing" evidence never requires irrefutable evidence; it does not even require proof beyond a reasonable doubt. It does require positive evidence, direct or circumstantial, that makes a proposition highly probable. And in the present context, when overcoming the community property presumption, it requires more than the self-serving testimony of the owner of the allegedly separate property. Once clear and convincing positive proof is offered to rebut the community property presumption, it is up to the party without the burden to contradict that evidence or introduce doubt.

In this case, Mr. Schwarz never contested the continuously separate property character of the eight assets that ended up in the D.A. Davidson account—to the contrary. When asked about Ms. Champagne's assets, he testified that he "did not mettle [sic] in her accounts or anything," because *"we were supposed to keep it separate* and split the

---

[98] CP at 77.
[99] Ex. P-19.

bills."[100] He merely relied on his lawyer to challenge whether Ms. Champagne had met her burden.

Ms. Champagne traced some assets in the WaMu account to and from the D.A. Davidson account, and ultimately traced all of the assets in the WaMu account to the Bank of America accounts. She traced the assets from the A.G. Edwards account and from the WM Financial account into the D.A. Davidson account. The fact that mutual fund share numbers increased slightly over time does not detract from her evidence; she testified and offered supporting documentary evidence that she had elected dividend reinvestment, so it was to be expected that the number of shares would increase. As earlier observed, dividends on separate property are themselves separate property.

The only instances in which Ms. Champagne failed to trace assets into the D.A. Davidson account were in the case of her IDS bond funds and Cabletron stock. She could not trace the $8,073.96 deposit to her WaMu checking account to the sale of allegedly appreciated bond funds and admitted that her subsequent deposit of $10,000 to her D.A. Davidson savings account included at least $1,900 in community funds. While she could trace her Cabletron shares into an E-Trade account and trace her purchase of Cisco shares to proceeds of Cabletron stock sales, she could not trace her account transfer from a different E-Trade account to those original Cabletron or Cisco shares. Those two

---

[100] RP at 132.

contributors to the D.A. Davidson account—(1) the $10,000 transferred from checking to savings in July 2000 that was ultimately contributed to the D.A. Davidson account in August 2000 and (2) the 500 Cisco shares contributed in September 2009—can be distinguished and apportioned. While the eight contributors to the D.A. Davidson account required a considerable amount of effort to explain and document, they did not give rise to hopeless commingling.

There are likely several ways to apportion for those contributions. The fact that a marital asset cannot be apportioned to the penny will not excuse the court from apportioning it; any reasonable approach to apportioning is acceptable and in arriving at final figures, the benefit of the doubt can be given to the community. We suggest an apportionment in an appendix.

## VII. EQUALIZATION PAYMENT AND MOTION FOR RECONSIDERATION

Ms. Champagne's remaining two assignments of error are that the court abused its discretion when it ordered her to make an equalization payment and when it denied her motion for reconsideration. Given our reversal of the trial court's characterization of three assets and our remand to the trial court to modify its characterizations and revisit its property distribution, these remaining issues are moot.

No. 32274-2-III
*In re Marriage of Schwarz*

We reverse and remand for proceedings consistent with this opinion.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

47

APPENDIX

1.    The $10,000 that Ms. Champagne attributes to the IDS bond fund but as to which she has not overcome the community presumption was deposited to her WaMu savings account in July 2000. *See* RP at 234.  We do not have Ex. R-131 in our record, but do have the February WaMu statement with an ending balance of $84,725 and the September statement with a beginning August 22 balance of $95,912. *See* Ex. R-120, at 7-8.  The $10,000 attributed to the IDS bond fund is reflected in the August 22 balance.

2.    It was on August 22 that $56,000 was withdrawn from the WaMu account for deposit to the D.A. Davidson account. *See* Ex. R-120, at 8 *and* Ex. R-121, at 7, 9. Since money is fungible and it is simplest to make the apportionment in the D.A. Davidson account (since it was the final repository of the separate assets), treat $10,000 of the $56,000 deposited to the D.A. Davidson account as presumptively community funds.

3.    The August month-end value of the D.A. Davidson account is $112,582.22. Ex. R-121, at 7.  Consistent with Mr. Carlson's approach in dealing with Mr. Schwarz's IRA, treat $10,000 ÷ $112,582.22 or 8.88 percent of the D.A. Davidson value thereafter as presumptively community property and 91.12 percent of the value thereafter as separate property.

4. The last D.A. Davidson account in our record is the May 2012 statement, revealing a month-end value of $106,611.53. Reduce that value by the month-end value of the 500 Cisco shares, which is $8,165, and three years' worth of the "ESTIMATED ANNUAL INCOME" from Cisco as disclosed by the statement, which is a total of $480.00, to arrive at a value, net of Cisco, of $97,966.53. *See* Ex. R-121, at 31.

5. Apply the percentages to adjust for the separate and presumptively community shares of the account arising from the $10,000 deposit in July 2000. The 91.12 percent of $97,966.53 demonstrated by Ms. Champagne to be separate property is $89,267, rounded. $8,699, rounded, is community property.