
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No.  37500-5-III |
| KELLEY L. OLSON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| RONALD J. OLSON, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — This dissolution appeal presents only property

characterization and distribution issues.  The primary issue is whether it is possible to

trace Kelley Olson's separate property interest in funds inherited from her father into

assets she and Ronald Olson purchased in part with funds from a commingled account.

A forensic accountant the parties were court ordered to retain concluded that half

of Kelley's[1] inherited funds could be traced.  Ronald characterizes the accountant's work

as an inadequate allocation, rather than tracing.  But the record on appeal supports the

conclusion that while the accountant ultimately relied on an allocation, he relied first and

foremost on tracing.  Ronald fails to demonstrate that clear and convincing evidence did

---

[1] Given the parties' common last name, it will be easier for the reader if we refer
to them by their first names.  We intend no disrespect.

not support the trial court's finding that Kelley had a separate property interest of

$82,189.05 in four of the parties' assets.

Because Kelley's separate property interest inhered in assets that the trial court

divided, an atypical financial adjustment was required. The trial court's calculation of

the payment needed to equalize its division of assets it treated as community property

was correct, but we agree with Ronald that the additional liability imposed on him to

address Kelley's separate property interest needs to be reduced by half.

We affirm the trial court's finding that Kelley had a traceable separate property

interest but remand for a correction of the amount owed by Ronald.

FACTS AND PROCEDURAL BACKGROUND

Ronald and Kelley Olson separated in early January 2018 after almost 32 years of

marriage. Their three children were adults. Ronald, who was 59 years old at the time of

trial, was no longer employed, having experienced progressive multiple sclerosis. He

was receiving social security benefits and disability benefits from a privately-purchased

policy. Kelley, age 53 at the time of trial, worked as a dental hygienist, but only part-

time. This was because the work took what the court found to be a "high toll" on her

back. Clerk's Papers (CP) at 104.

Through the parties' many years of employment, their careful financial

management, and to a limited extent an inheritance Kelley received late in the marriage,

they held assets with a net value of $2 million at the time of trial. Among the most substantial of their assets were nine residential rental properties.

For purposes of the trial, the Olsons agreed to value the rental properties at their assessed tax values. The assessed tax values of the rental properties and the mortgages against them at the time of trial were as follows:

| Property | Value | Mortgage remaining |
|---|---|---|
| Augusta Property | $117,900 | $60,385 |
| Dean Property | $105,900 | $60,118 |
| 1107 Knox Property | $125,400 | $57,687 |
| 429 Knox Property | $153,900 | $84,419 |
| 613 Knox Property | $130,300 | $84,217 |
| Madison Property | $239,500 | $103,702 |
| Olympic Property | $184,650 | $113,210 |
| Rowan Property | $227,230 | $152,177 |
| 7th Ave. Property | $171,300 | $81,607 |

CP at 77-78.

It was Kelly's position at trial that $164,378 she had inherited from her father between the spring of 2011 and the end of 2014 had been used to make the down payments for the Madison, 7th Avenue, and Olympic rental properties, and that she had a traceable separate property interest in them. On that basis, she sought to have those

properties (among other assets) distributed to her.[2] But she had deposited her inherited funds in a joint savings account that the couple maintained with the Spokane Firefighters Credit Union (SFCU), into which community funds had sometimes been deposited, and the assets of which were sometimes applied to community expenses.

Kelley testified that her reason for depositing the inherited funds into the SFCU savings account was that the account was infrequently used, "so that was kind of kept separate in there." Report of Proceedings (RP) at 44-45. She testified that when her father passed away she wanted to keep her inherited funds as separate property, but at the time she and Ronald had recently reconciled after a period of separation. She explained at trial,

---

[2] The evidence established that Kelley received funds from her father's estate in the following amounts, on the following days:

| | |
|---|---|
| April 4, 2011 | $33,158.61 |
| July 22, 2011 | $3,166.67 |
| September 23, 2011 | $19,573.90 |
| February 14, 2012 | $11,270.00 |
| August 10, 2012 | $8,416.67 |
| August 15, 2012 | $9,819.12 |
| May 3, 2013 | $8,249.57 |
| April 21, 2014 | $6,719.57 |
| December 31, 2014 | $64,004.00 |
| **Total** | **$164,378.11** |

Exs. P7, P8, P9, P17, P18, P19, P22, P24, P25.

[I] didn't really want to put them in a separate account with just my name. It would look like I wasn't actually trying to work on our marriage. So that would be kind of a red flag if I asked to put the money in a separate account just in my name when we'd just gotten back together, so I put it in a savings account where it could be traced.

RP at 45.

Ronald did not share Kelley's view that down payments for the Madison, Olympic, and 7th Avenue properties were made with her separate funds. He could point to the facts that Kelley did not keep contemporaneous records of any segregation, and the properties were purchased and financed in both parties' names. Kelley conceded that the decisions to buy the three properties were joint decisions and that she and Ronald both participated in managing the properties.

After two days of trial, it was clear that this separate property tracing issue could be material to the property division. The trial court recessed trial and ordered the parties to identify a mutually-acceptable accountant to review whether Kelley's inherited funds could be traced to a separate property interest. The parties engaged certified public accountant Scott Martin, and a couple of months later trial resumed for a third and final day of trial at which Mr. Martin testified.

Mr. Martin testified that he invited both parties to provide him with financial information and, after meeting with Kelley and reviewing her records, he prepared a detailed spreadsheet of the deposits to, and expenditures from, the SFCU savings account. It was admitted as exhibit 75. He determined that Kelley's deposits to the

5

SFCU savings account of inherited funds totaled the $164,378.11 identified above. He testified that he treated any deposit made that was not identifiable as inherited by Kelley from her father as community funds. What we prefer to call these "other deposits" to the savings account totaled $163,560.00.

Significantly, Mr. Martin's testimony established that the "other deposits" were in part a return and reinvestment of Kelley's inherited funds. Because the SFCU account was used when large assets were bought and sold, some part (and possibly a large part) of the "other deposits" were not new infusions. Mr. Martin testified that vehicles and even real property was purchased and sold with the cost and proceeds "coming and going" through the account. RP at 307. He identified the dollar amount in one case: $31,700.00 from the account was used to purchase a recreational vehicle (RV) that the parties owned for less than a year before selling it for $41,131.99 that was redeposited to the account. The $41,131.99 is included in the $163,560.00 and was treated as presumptively community, even though it would be more reasonable to trace its character to the funds used to purchase the RV.

We do not know how large a part of the $163,560 was recycled through the account as part of these "comings and goings" for two reasons. One reason is that Mr. Martin was not asked about it. A second reason, more relevant to our decision, is that exhibit 75, the critical spreadsheet, was not designated as part of the record on appeal.

Mr. Martin testified that the result of his "overall analysis" was that "but for the inheritance [of] funds" there would not have been enough money to purchase the three properties Kelley contended were traceable, as well as a fourth: the 429 Knox property. RP at 310. His first example of a property necessarily purchased with substantially inherited funds was the Madison property purchased in July 2011. Mr. Martin testified that on January 21, 2011, the balance in the SFCU savings account was only $12,144.28. Not knowing its source, he treated the $12,144.28 as community funds. On April 4, 2011, Kelley made her first deposit of inherited funds in the amount of $33,158.61. On July 22, 2011, she made her second deposit of inherited funds of $3,166.67. The Madison property was purchased in July 2011 with a down payment of $31,049.23 that Mr. Martin testified came from the SFCU savings account. Mr. Martin testified he had no difficulty concluding that the down payment on the Madison property was substantially inherited funds, since "but for" inherited funds, $31,049.23 was not available from the account. RP at 307.

Mr. Martin also concluded that down payments made from the SFCU savings account for the 429 Knox, 7th Avenue, and Olympic properties were substantially inherited funds. He explained that this was because the $146,380.89 balance in the savings account before those purchases was almost entirely depleted by the down payments for those properties ($41,407.75, $38,659.77 and $56,315.14, respectively) between September 2015 and August 2016. With these properties, too, Mr. Martin

7

testified "the source of funds to buy the rental—the properties have to be traced back to some separate property component; otherwise there would not have been enough funds to buy those houses." RP at 310.

At the conclusion of the trial, the court took the matter under advisement, later issued a memorandum decision, and thereafter entered findings of fact, conclusions of law, and the final divorce order. Relevant to the issues on appeal, the trial court found:

> . . . Mr. Martin testified by and through his analysis that the petitioner deposited into the SFFCU account $164,378.11, which could be conclusively shown to have come directly from the petitioner's late father's estate. However, when it came to tying a specific down payment on a rental purchase to the petitioner's inheritance, Mr. Martin testified that he was unable to link all nine rentals to down payments provided from petitioner's inheritance funds. *Mr. Martin also testified unequivocally that four of the rentals without question received down payment contributions directly from the petitioner's inheritance.* Said another way, Mr. Martin testified that 50% of the amount the petitioner received as inheritance funds could be traced, in the amount of $82,189.05.
>
> . . . The Court finds that the petitioner has demonstrated through clear and convincing evidence that the sum of $82,189.05 should be reimbursed to her. Fairness requires and the equities of this case mandate no less.

CP at 101-02 (emphasis added).

Based on the values assigned and distribution ordered, the trial court calculated that Ronald was left with a net estate of $1,103,425.90 and Kelley was left with a net estate of $921,082.50. The court ordered Ronald to pay Kelley a total "equalization payment" of $264,562.45, which it described as "represent[ing] the combination of

8

separate property reimbursement to [Kelley] of $82,189.05, plus $182,373.40 in required marital estate equalization." CP at 105.

Ronald moved for reconsideration. He pointed out a small arithmetic discrepancy between the trial court's figures for the net estate distributed to each party and the total net estate. He also claimed that the trial court's approach to calculating the marital estate equalization and the separate property reimbursement incorrectly doubled or almost doubled Ronald's liability in both cases.

In responding to Ronald's motion, Kelley agreed that the trial court's findings included an error, by understating the value of the net estate it ordered distributed to Ronald. But she contended that its marital estate equalization payment was correct. As for the order that Ronald pay her $82,189.05 as a separate property reimbursement, she argued that "[b]ased on the total contributions of over $160,000" she had made, the court's adjustment for her separate property interest "is supported by the evidence including the expert's opinion, and the equities of the case." CP at 126-27.

Ronald's motion for reconsideration was denied. He appeals.

ANALYSIS

In a dissolution proceeding, all property, whether separate or community, is before the court for distribution. *In re Marriage of Schwarz*, 192 Wn. App. 180, 188, 368 P.3d 173 (2016). The character of property, whether separate or community, is determined at its acquisition. *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 865, 855 P.2d 1210

(1993). It is presumed assets acquired during the marriage are community property. *In re Marriage of Chumbley*, 150 Wn.2d 1, 5-6, 74 P.3d 129 (2003); RCW 26.16.030. But an asset acquired during marriage by gift or inheritance is separate property, as is an asset acquired during marriage with the traceable proceeds of separate property. *In re Marriage of White*, 105 Wn. App. 545, 550, 20 P.3d 481 (2001); RCW 26.16.010. While a trial court is not bound to award property to the individual or the community based on the property's classification, "the court must have in mind the correct character and status of the property as community or separate before any theory of division is ordered." *Blood v. Blood*, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966). "Separate property will remain separate property through changes and transitions, if the separate property remains traceable and identifiable." *Chumbley*, 150 Wn.2d at 5.

A party wishing to establish that an asset acquired during marriage is separate property must present clear and convincing evidence that the acquisition fits within a separate property provision. *Id.* The "clear and convincing" evidence standard does not require irrefutable evidence; nor does it require proof beyond a reasonable doubt. *Schwarz,* 192 Wn. App. at 218. "It does require positive evidence, direct or circumstantial, that makes a proposition highly probable." *Id.* The requirement of clear and convincing evidence is not met by the mere self-serving declaration of the spouse claiming the property in question that he acquired it from separate funds and a showing that separate funds were available for that purpose. *Pollock v. Pollock*, 7 Wn. App. 394,

10

400, 499 P.2d 231 (1972). "'Separate funds used for such a purpose should be traced with some degree of particularity.'" *Id.* (quoting *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)). "If separate property becomes so commingled that it is impossible to distinguish or apportion it, then the entire amount becomes community property." *Chumbley*, 150 Wn.2d at 5-6; *see also In re Marriage of Skarbek*, 100 Wn. App. 444, 448-49, 997 P.2d 447 (2000).

A trial court's characterization of property as separate or community presents a mixed question of law and fact. *In re Marriage of Kile & Kendall*, 186 Wn. App. 864, 876, 347 P.3d 894 (2015) (citing *In re Marriage of Martin*, 32 Wn. App. 92, 94, 645 P.2d 1148 (1982)). "'The time of acquisition, the method of acquisition, and the intent of the donor, for example, are questions for the trier of fact.'" *Id.* (quoting *Martin*, 32 Wn. App. at 94). Accordingly, whether or not a rebuttable presumption of community or separate character is overcome is a question of fact. *See id.* at 881 (reviewing whether substantial evidence supports overcoming the presumption); *In re Marriage of Mix*, 14 Cal.3d 604, 612, 536 P.2d 479, 122 Cal. Rptr. 79 (1975). We review the factual findings supporting the trial court's characterization for substantial evidence. *Schwarz*, 192 Wn. App. at 191-92. The ultimate characterization of the property as community or separate is a question of law that this court reviews de novo. *Id.*

Mr. Martin testified repeatedly that he was able to trace inherited funds into four of the parties' rental properties because down payments were made from the SFCU

11

savings account and could not have been made without using inherited funds.  *See, e.g.*,

RP at 307 ("but for the inheritance . . . deposit there would not have been enough funds to

buy [the Madison] house"); RP at 310 ("So, again, the overall analysis is that but for the

inheritance funds, there would not have been enough money to purchase the properties.");

*id.* ("[T]he source of funds to buy the rental—the properties have to be traced back to

some separate property component; otherwise there would not have been enough funds to

buy those houses.").  This is easy to see with the purchase of the Madison house.  Since

the down payment of $31,049.23 was made from the account[3] and all but $12,144.28 of

the funds in the account were Kelley's inherited funds, a clearly traceable separate

property investment of $18,904.98 was made in the house.[4]

Mr. Martin could have had the same level of confidence that inherited funds could

be traced into the 429 Knox, 7th Avenue, and Olympic properties through down

payments from the SFCU savings account.  Ronald attempts to persuade us that the

$163,560 in "other deposits" and the use of funds from the account to pay community

expenses make tracing impossible, since inherited funds could have been applied to

consumptive expenses and "other deposits" could have been applied to down payments.

---

[3] Ronald attempted to cast doubt on the source of the funds, but the evidence that the down payment came from the SFCU savings account was sufficient.  *See, e.g.*, RP at 232-33, 324-26; Ex. P6 at 13, P12.

[4] We ignore interest earned in the account between January and July 2011, and acknowledge that the community investment would be inconsequentially larger and the separate investment inconsequentially smaller.

But his argument ignores the "goings and comings" of reinvested funds.

A hypothetical will illustrate the importance of reinvested funds. The following hypothetical history of transactions assumes an infrequently used account held by a married couple into which one spouse deposits inherited funds, the couple deposits community income tax refunds, some funds are transferred from the account to cover overdrafts in a related checking account, and there are purchases and sales of vehicles in addition to down payments made toward three properties.

| | Expenditure | Community property deposit | Separate property deposit | Proceeds from sale of earlier-purchased asset | Account balance |
|---|---|---|---|---|---|
| Inherited funds | | | 20,000 | | 20,000 |
| Income tax refund | | 10,000 | | | 30,000 |
| Inherited funds | | | 40,000 | | 70,000 |
| Purchase of RV | (50,000) | | | | 20,000 |
| Inherited funds | | | 40,000 | | 60,000 |
| Purchase of truck | (50,000) | | | | 10,000 |
| Sale of RV | | | | 60,000 | 70,000 |
| Tfr to joint checking | (10,000) | | | | 60,000 |
| Income tax refund | | 10,000 | | | 70,000 |
| Inherited funds | | | 35,000 | | 105,000 |
| Sale of truck | | | | 40,000 | 145,000 |
| Purchase of car | (40,000) | | | | 105,000 |
| Tfr to joint checking | (10,000) | | | | 95,000 |
| Down payment on property | (40,000) | | | | 55,000 |
| Down payment on property | (40,000) | | | | 15,000 |
| Sale of car | | | | 35,000 | 50,000 |
| Down payment on property | (50,000) | | | | 0 |

As can be seen, the amount of inherited funds deposited ($135,000) is close to the amount of "other deposits" (community property and proceeds from asset sales total $155,000). $20,000 is transferred to cover overdrafts in the joint checking account. Yet despite those facts, it can still be concluded with complete confidence that there is a very substantial separate property investment in the three properties whose down payments came from the account. Indeed, since only $20,000 in community property was ever deposited in the account, one can conclude that a minimum of $110,000 of the $130,000 property down payments is traceable to separate property. In Mr. Martin's parlance, "[B]ut for the inherited funds, there would not have been enough money to purchase the properties." RP at 310.

Since exhibit 75 was not made a part of our record we cannot be sure that Mr. Martin's confidence in his ability to trace at least $82,189.05 was supported by a similar analysis, but clearly tracing of that sort could have been possible. And it is suggested by Mr. Martin's testimony that before the purchase of the 429 Knox, 7th Avenue, and Olympic properties, "there was $146,380.39 in the account, some of which was the buying and selling of the vehicles, and the rest of it predominantly related to the inheritance deposits we went through." RP at 311.

The uncertainty must be held against Ronald, for failing to include exhibit 75 in the record on appeal. RAP 9.2(b) provides that "[i]f the party seeking review intends to

14

urge that a verdict or finding of fact is not supported by the evidence, the party should include in the record all evidence relevant to the disputed verdict or finding." Because the party seeking appellate review has the burden to provide an adequate record to review his issues, the trial court's decision must stand if this burden is not met. *Fahndrich v. Williams*, 147 Wn. App. 302, 307, 194 P.3d 1005 (2008).

Ronald's argument on appeal ignores Mr. Martin's testimony that his tracing was based on the fact that for the four properties he identified, there was insufficient money in the savings account to make down payments without relying on the inherited funds. Instead, Ronald treats Mr. Martin's conclusions as based solely and simplistically on the fact that roughly half the deposits to the account were inherited funds and the other half were treated by Mr. Martin (at least for some purposes) as community funds. If that was the only basis for Mr. Martin's conclusion, Ronald would be right; that would not be tracing. But Mr. Martin repeatedly explained his conclusion as based on the fact that the account balance at relevant times was insufficient to make the four down payments without relying on substantial inherited funds. He explained that arriving at a 50 percent figure for the traceable funds was "difficult" and was "why we're here." RP at 313. Considering Mr. Martin's testimony as a whole, his decision to default to 50 percent appears to have been a conservative approach to arriving at a number that could not be precisely determined, since some funds in the account—arguably inherited funds—were being consumed for other purposes. From what we know about the transactions in the

15

account, his treatment of only 50 percent of the inherited funds as traceable likely

benefitted Ronald. Ronald fails to demonstrate that the trial court's finding is not

supported by clear and convincing evidence.[5]

While Mr. Martin's testimony serves as substantial evidence supporting the trial

court's finding that Kelley was entitled to a separate property reimbursement of

$82,189.05, the trial court's findings also imply that it would have made the same

property distribution even if it had found no traceable separate property interest in the

rental properties. A trial court can make a disproportionate award of community property

to a spouse when her or his separate property materially benefits the parties before losing

its separate character. *See, e.g.*, *In re Marriage of Nuss*, 65 Wn. App. 334, 828 P.2d 627

(1992) (origin of community property as one party's separate property may be considered

as a reason for awarding all or a disproportionate share to that party); *In re Marriage of*

*Tulleners*, 11 Wn. App. 2d 358, 371, 453 P.3d 996 (2019) (court could make a disparate

---

[5] We can summarily reject two passing arguments made by Ronald that are not supported by the record. He represents that Mr. Martin testified he applied a "more likely than not" standard when determining whether the inherited funds could be traced. RP at 323. What Mr. Martin actually did was merely answer "yes" when Ronald's lawyer asked if he could say it was more likely than not the funds were traceable. Mr. Martin never said that he applied a predominance standard or that that the funds were not clearly and convincingly traceable.

Ronald also represents that Mr. Martin testified that the "SFCU account" was hopelessly commingled. But what he actually said was that the *account balance remaining at the end* was hopelessly commingled. RP at 303, 314. Since Mr. Martin concluded that half the inherited funds could be traced to down payments, he necessarily concluded that those funds, at least, were not hopelessly commingled.

award of hopelessly commingled retirement assets if presented with reliable evidence of the separate value brought into the marriage). This appears to have been what the trial court had in mind when, in addition to finding that Kelley established a separate property interest, it further supported her right to reimbursement by finding that "[f]airness requires and the equities of this case mandate no less." CP at 102.

CHALLENGES TO THE CALCULATION OF RONALD'S EQUALIZATION PAYMENT

Ronald raises two challenges to the calculation of the $264,562.45 equalization payment he was ordered to pay to Kelley. We begin with his challenge to the marital estate equalization component of the payment.

A.      *Calculation of the marital estate equalization*

Ronald challenges the trial court's order that he pay $182,373.40 to Kelley as a marital estate equalization payment.

The trial court's findings on "Net Estate Value/Equalization" state that it awarded Ronald a "gross estate of $1,950,425.40" and "a net estate of $1,103,425.90." CP at 105 (some capitalization omitted). It found that it awarded Kelley a "gross estate of $1,310,541.50" and "a net estate of $921,082.50." *Id.* It found that the required marital estate equalization amount was "$182,373.40." *Id.* Kelley argued below and argues on appeal that the trial court understated Ronald's net estate, but that the marital estate equalization amount is correct. It is clear that the trial court either misstated Ronald's net

estate or miscalculated the marital estate equalization amount. One number or the other is wrong; both cannot be correct.

As demonstrated by the following distribution summary that we base on the court's memorandum decision, Kelley appears to have been correct about where the mistake was made. The value of the net estate distributed to Ronald was much higher than reflected in the trial court's findings.

| Olson Property and Debt | Value | Debt | Net Value | Husband | Wife |
|---|---|---|---|---|---|
| Westlake Drive | $ 650,000.00 | $ (250,533.00) | $ 399,467.00 | $ 399,467.00 | |
| Augusta Ave | $ 117,900.00 | $ (60,385.00) | $ 57,515.00 | | $ 57,515.00 |
| Dean Ave | $ 105,900.00 | $ (60,118.00) | $ 45,782.00 | $ 45,782.00 | |
| 1107 Knox | $ 125,400.00 | $ (57,687.00) | $ 67,713.00 | | $ 67,713.00 |
| 429 Knox | $ 153,900.00 | $ (84,419.00) | $ 69,481.00 | $ 69,481.00 | |
| 613 Knox | $ 130,300.00 | $ (84,217.00) | $ 46,083.00 | $ 46,083.00 | |
| Madison Ave | $ 239,500.00 | $ (103,702.00) | $ 135,798.00 | $ 135,798.00 | |
| Olympic | $ 184,650.00 | $ (113,210.00) | $ 71,440.00 | | $ 71,440.00 |
| Rowan | $ 227,230.00 | $ (152,177.00) | $ 75,053.00 | | $ 75,053.00 |
| 7th Ave | $ 171,300.00 | $ (81,607.00) | $ 89,693.00 | $ 89,693.00 | |
| Pontoon Boat | $ 4,460.00 | $ - | $ 4,460.00 | $ 4,460.00 | |
| firearms | $ 1,500.00 | $ - | $ 1,500.00 | $ 1,500.00 | |
| Honda CRV | $ 3,700.00 | $ - | $ 3,700.00 | $ 3,700.00 | |
| Chevy Pickup | $ 6,500.00 | $ - | $ 6,500.00 | $ 6,500.00 | |
| Honda Accord | $ 20,000.00 | $ (6,000.00) | $ 14,000.00 | | $ 14,000.00 |
| WA Trust (rental acct) | $ 62,217.00 | $ - | $ 62,217.00 | $ 31,108.50 | $ 31,108.50 |
| SFCU Savings | $ 4,059.00 | $ - | $ 4,059.00 | $ 2,029.50 | $ 2,029.50 |
| SFCU Checking | $ 15,236.00 | $ - | $ 15,236.00 | $ 7,618.00 | $ 7,618.00 |
| Car Wash Contract | $ 298,020.00 | $ - | $ 298,020.00 | $ 149,010.00 | $ 149,010.00 |
| NW Mutual IRA | $ 44,076.00 | $ - | $ 44,076.00 | | $ 44,076.00 |
| Ameritrade 072836 | $ 122,040.00 | $ - | $ 122,040.00 | | $ 122,040.00 |
| Ameritrade 072831 | $ 454,759.00 | $ - | $ 454,759.00 | $ 227,379.50 | $ 227,379.50 |
| Ameritrade 198623 | $ 102,140.00 | $ - | $ 102,140.00 | $ 51,070.00 | $ 51,070.00 |
| Misc Household goods | $ 16,177.50 | $ - | $ 16,177.50 | $ 15,147.50 | $ 1,030.00 |
| **TOTALS** | **$ 3,260,964.50** | **$ (1,054,055.00)** | **$ 2,206,909.50** | **$ 1,285,827.00** | **$ 921,082.50** |

Ronald relies on the court's misstatement of the value of his net estate to argue that the marital estate equalization payment should be only $91,171.70. Opening Br. of Appellant at 33. We disagree; what should be corrected instead is the erroneous finding of the value of Ronald's net estate.

According to the foregoing distribution summary, the value of one-half of the estate is $1,103,454.75, and a payment by Ronald to Kelley of $182,372.25 gets them both to that amount.[6] Given how close this equalization payment is to the payment calculated by the court, we are confident that it mistakenly substituted the value of one-half of the estate for the value of Ronald's net estate in its findings.

The trial court did not err in calculating the marital estate equalization amount. (We are unable to determine the reason for the de minimis $1.15 difference between the trial court's calculation and our own. No correction of that amount is required on remand.)

B.      *Calculation of the separate property reimbursement*

Ronald also complains that requiring him to pay Kelley an additional $82,189.05 to reimburse her separate property interest overpays her by a factor of two. Because her separate property interest inhered in assets that the trial court was treating as community property and chose to divide using a marital estate equalization payment, we agree that the calculation of the adjustment for separate property needed to take into consideration the fact that division of the community property already gave Kelly "her" half of the separate property. All of the rental properties in which her separate property inhered were distributed, and the equalizing payment ensured that she received her 50 percent

---

[6]      $1,285,827.00 - $182,372.25 = $1,103,454.75
$921,082.50 + $182,372.25 = $1,103.454.75

20

share. So the $1,103,454.75 in net assets she received included one half of her separate

property interest ($41,904.525) and Ronald's $1,103.459.75 in net assets included the

other half. We agree with Ronald that he should have been required to pay her

$41,904.53 to account for her separate property interest.

This is an atypical adjustment and not intuitive. That it is the correct outcome can

be confirmed by analyzing what Kelley would have received had she been compensated

with community property *before* calculating the marital estate equalization component.

Assume she was compensated using the bank accounts and the payments owed under the

car wash contract, since those assets are sufficient and were allocated 50/50 by the court.

In that case, she would have received her $82,189.05 off the top. Not only would the net

value of the combined assets be reduced by $82,189.05, but the net value of the

community assets distributed to each party would be reduced by $41,094.525.

| Total net value | Husband net value | Wife net value |
|---|---|---|
| $ 2,124,720.45 | $ 1,244,732.475 | $ 879,987.975 |

One-half the value of the combined net estate would have been reduced to

$1,062,360.22; the equalization payment would remain the same.[7] The bottom line to the

parties? Instead of Ronald ending up with $1,285,827.00 – $182,372.25, or

$1,103,454.75, he would end up with $1,244,732.475 – $182,372.25, or $1,062,360.225:

---

[7] $1,244,732.475 – $182,372.25 = $1,062,360.22
$879,987.975 + $182,372.25 = $1,062,360.22

in other words, $41,094.525 less. Instead of Kelley ending up with $921,082.50 +

$182,372.25, or $1,103,454.75, she would end up with $82,189.05 + $879,987.975 +

$182,372.25, or $1,144,549.27: in her case, $41,094.525 more.

$41,094.53, rather than $82,189.05, should have been the payment required of

Ronald as a separate property reimbursement. The matter is remanded for a correction of

the finding of the net value of assets distributed to Ronald and a reduction of the

equalization payment to reflect that reduction.

We reverse the amount of the equalization payment ordered by the trial court and

remand with directions to correct the finding of the net value of Ronald's assets and to

reduce the equalization payment to a total of $223,467.93.[8]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, A.C.J.

WE CONCUR:

_____          _____
Staab, J.                                              Fearing, J.

---

[8] Kelley requested an award of attorney fees under RAP 18.1(a) and RAP 18.9(a), arguing that Ronald's appeal was frivolous. Since we agree with one of his assignments of error his appeal cannot be characterized as frivolous. The request for fees is denied.