IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Marriage of: | No. 83963-2-I |
| SOUSAN OVEISI, | DIVISION ONE |
| Respondent, | |
| and | UNPUBLISHED OPINION |
| JAMAL HAKIMI, | |
| Appellant. | |

SMITH, C.J. — Jamal Hakimi, representing himself, appeals the final orders dissolving his marriage to Sousan Oveisi.  Hakimi argues (1) the trial court erred when it characterized the family home as community property; (2) the court erred in attributing an amount of cash as an asset to Hakimi; (3) the court failed to equally divide the parties' property, as intended; and (4) the court abused its discretion in declining to order spousal maintenance.  Because the trial court acted within its broad discretion in applying the relevant statutes to the facts established by evidence at trial, we affirm.

FACTS

Sousan Oveisi and Jamal Hakimi married in Tehran, Iran in 1998.  After the marriage, Hakimi returned to Washington State, where he had lived before the marriage, while Oveisi remained in Iran.  In early 2001, after the parties' first child was born and two and a half years after the marriage, Oveisi and the parties' daughter moved to Washington, under Hakimi's sponsorship.  The family

Citations and pin cites are based on the Westlaw online version of the cited material.

lived in a Tukwila residence Hakimi purchased in 1999.  About seven or eight years after Oveisi moved to Washington, the family moved into an entirely new home built on the same Tukwila property.  The parties hired different contractors to build the components of the house and performed some of the work themselves.  For almost the entire duration of the parties' more than 20-year marriage, Oveisi worked as a nurse and was the family's primary wage earner.

Oveisi petitioned for dissolution in November 2020.  In response to the petition, Hakimi asserted that the family home in Tukwila was his separate property and requested an award of spousal maintenance.

After several delays, the court held a two-day bench trial in March 2022. Hakimi represented himself at trial.  Oveisi and Hakimi, then 61 and 72 years old, respectively, were the primary witnesses at trial.[1]  The court also considered almost 70 exhibits in conjunction with the testimony.

Following the trial, the court divided the parties' assets.  After determining that the family home in Tukwila was a community asset, the court awarded the property to Oveisi as well as the parties' 50 percent interest in real property in Tehran they co-owned with Oveisi's brother.  The court awarded two other properties to Hakimi, a commercial property in Tacoma and undeveloped property in Snoqualmie.  The court awarded to Oveisi the full value of her retirement account through her primary employer, CHI Franciscan Health, and attributed as an asset to her, $37,000 in cash.  It attributed a larger amount of

---

[1] The court also considered the testimony of Oveisi's brother, who testified from Iran via Zoom, a web conferencing platform.

cash, $97,943, to Hakimi and awarded to each party the balance of certain bank accounts. It awarded two vehicles to Hakimi and three to Oveisi, with the understanding that Oveisi would transfer the titles to two of the vehicles to the parties' adult daughters, who were each in possession of a vehicle. The court declined to award spousal maintenance to Hakimi. Hakimi sought reconsideration and the court denied his motion.

Hakimi appeals.

ANALYSIS

Hakimi challenges several aspects of the trial court's distribution of property and the decision not to award spousal maintenance to him. On review of dissolution proceedings, our supreme court has observed that "[t]he emotional and financial interests affected by such decisions are best served by finality." In re Marriage of Landry, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). Accordingly, "[t]he spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court." Landry, 103 Wn.2d at 809. "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). " 'We will not substitute our judgment for the trial court's, weigh the evidence, or adjudge witness credibility.' " DeVogel

v. Padilla, 22 Wn. App.2d 39, 48, 509 P.3d 832 (2022) (quoting Greene v. Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999)).

The trial court specifically has broad discretion in distributing marital property. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). RCW 26.09.080 guides the trial court's distribution of property and provides that a trial court must dispose of property in a manner that is "just and equitable" after considering (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse. Rockwell, 141 Wn. App. at 242.

Where, as here, the trial court has weighed the evidence, our role on review is to determine whether substantial evidence supports the findings of fact, and in turn, whether the findings support the trial court's conclusions of law. Id. " 'Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.' " Id. (quoting In re Marriage of Griswold, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002)).

### Characterization of Property

Hakimi contends that the trial court erred when it characterized the Tukwila home as community property.

In performing its obligation to equitably distribute all property, community and separate, under RCW 26.09.080, the trial court must characterize the property as either community or separate. In re Marriage of Kile, 186 Wn. App.

4

864, 875, 347 P.3d 894 (2015). Washington courts presume property acquired during marriage is community property. Kile, 186 Wn. App. at 876. To overcome the presumption, a party must offer clear and convincing evidence that a property was obtained with separate funds, and those funds can be traced " 'with some degree of particularity.' " Schwarz v. Schwarz, 192 Wn. App. 180, 189, 368 P.3d 173 (2016) (quoting Berol v. Berol, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)). Separate property is statutorily defined as property acquired before marriage or acquired afterward by a gift or inheritance. RCW 26.16.010.

Hakimi maintains that there "really is no question" that the Tukwila property, purchased after the marriage, is his separate property because he used assets accumulated before the marriage toward the purchase of the home and because Oveisi transferred her interest in the property to him. Hakimi points to evidence that he sold a parcel of property in Washington before the marriage, received a final payoff amount in 1999, and used those proceeds to pay the down payment.[2]

Hakimi is correct that the evidence in the record does not support the trial court's finding that "commingled assets" from a joint account were used to pay the down payment. But even so, the trial court did not err in concluding that the "Tukwila property is and has always been community property." See Skagit County Pub. Hosp. Dist. No. 1 v. Dep't of Revenue, 158 Wn. App. 426, 449, 242 P.3d 909 (2010) ("an erroneous finding of fact not materially affecting the

---

[2] Based on these facts, Hakimi took the position in his proposed property division spreadsheet that he had a fractional separate property interest in the Tukwila property.

conclusions of law is not prejudicial and does not warrant reversal."). The trial court correctly characterized the Tukwila property as a community asset because it was acquired after the marriage, and nothing in the record suggests that Hakimi obtained the funds used for the down payment through a gift or inheritance.

Nor is there any clear and convincing proof that separately traceable inherited funds were the source of payments for the balance of the purchase price. According to the testimony at trial, in 2000, after the purchase of the Tukwila property, Hakimi sold a building in Iran and deposited the proceeds into a joint bank account in Iran, into which Oveisi had also deposited the savings she accumulated during her 15-year career as a nurse in Iran.[3] Testimony also indicated that the parties' assets from the joint account were used to pay the balance of the purchase price. Hakimi points to several trial exhibits showing installment payments to the seller beginning in 2000 and indicating that the balance of the loan on the Tukwila home was paid in 2002. But the documentary evidence does not reveal the source of the funds used for the installment payments or contradict the trial testimony. To the extent the court's conclusion rests on the finding that the balance owed on the Tukwila home was paid with "commingled assets" deposited in a joint bank account, the record supports the finding.

---

[3] Hakimi mentioned in his opening and closing remarks that he inherited the property he sold in Iran, but he points to no evidence in the record to substantiate this assertion.

6

The court also found that the quit claim deed signed by Oveisi in 1999 was not sufficient to overcome the presumption that the property was a community asset. Although the court did not make an express credibility finding, the court found that "[a]t that time, not long after the marriage, [Oveisi] was still living in Tehran, Iran, and did not speak or read English. She understood that her signature was needed to complete the purchase of a home here, where the couple intended to live." Evidence in the record supports the finding. Oveisi testified that when she signed the document, drafted in English, she did not understand the language well enough to appreciate the content. She explained that she only understood that Hakimi would be unable to complete the purchase unless she signed the document as he requested.

The court did not err in its characterization of the Tukwila property as community property. The property was acquired after the marriage and Hakimi failed to overcome the presumption by establishing, through clear and convincing evidence, that it was obtained with separate assets, i.e. funds acquired by gift or inheritance.[4]

<u>Attribution of Cash Assets</u>

Hakimi challenges the trial court's attribution to him of $97,943 in cash assets based on an "[e]stimated" amount of unexplained withdrawals from the

---

[4] While Hakimi contends on appeal that the trial court lacked authority to allocate ownership of the property located in Iran, we note that Hakimi did not raise this issue below, and in fact, he proposed allocation of the parties' ownership interest in that property to Oveisi. We decline to address this argument further. See RAP 2.5(a). And, insofar as Hakimi claims that the error in characterizing the Tukwila property as community property resulted in an "unfair distribution of property," we reject the premise of this argument.

7

parties' joint accounts. This allocation was based, in part, on Oveisi's testimony that she discovered a "large amount of cash" in Hakimi's bedroom and was thereafter locked out of the room. Oveisi provided evidence and testified about specific withdrawals from the parties' bank accounts which she attributed to Hakimi and claimed that he retained the funds and did not use them for community expenses. Oveisi initially identified withdrawals that totaled approximately $292,000, but based on off-the-record discussions, accepted Hakimi's explanations for most of the withdrawn amounts and reduced the amount of her claim of allegedly retained funds by approximately two-thirds.

Hakimi challenges a specific portion, $32,000, of the amount allocated to him. Hakimi points out that Oveisi's testimony that two cash withdrawals of $16,000 in 2012 and 2015 corresponded to travel to Iran is inconsistent with other evidence in the record. In particular, Oveisi's Exhibit No. 17 lists dates of seven trips to Iran and documents certain expenses in connection with those trips, but does not include any trips in 2012 or 2015.[5]

It appears that prior to trial, Hakimi took the position that Oveisi was responsible for the 2012 withdrawal of $16,000 and that she took the money to Iran. And he claimed that Oveisi withdrew the same amount in 2015 because she signed a withdrawal slip. In response, Oveisi claimed that Hakimi had complete control of the parties' accounts, that she never went to the bank or

---

[5] Oveisi testified that she created the exhibit to rebut Hakimi's allegations that she stole or otherwise diverted community assets in conjunction with family trips to Iran.

withdrew any funds alone, and only signed a withdrawal slip at his request. Oveisi also pointed out, pretrial, that she traveled to Iran in 2014, but not in 2012.

However, at trial, Oveisi maintained that the timing of both withdrawals corresponded with travel to Iran, and that Hakimi withdrew the cash and retained most of the withdrawn funds for himself. Oveisi did not testify that the dates specified on Exhibit 17 were the only times she travelled to Iran, and suggested at another point in her testimony that she travelled to Iran a total of eight, not seven, times. She was not asked about her previous specific denial of travel in 2012.

Although the record could be clearer concerning the timing and context of the documented withdrawals, the trial court expressly found that Oveisi's testimony about the retained funds was credible. Thus, the court credited Oveisi's trial testimony that until 2020, only Hakimi withdrew money from the parties' accounts and she did not take the withdrawn funds to Iran, over Hakimi's general denial that he retained no community funds for his own purposes. As the trier of fact, it was the court's responsibility to weigh credibility, resolve conflicts in the evidence, and determine what inferences could be drawn from the evidence.

As to other amounts included in the court's calculation, Hakimi points out that Oveisi's chart summarizing the alleged unexplained withdrawals, lists all dates in the year 2021 and is inconsistent with the testimony about timing of withdrawals. However, it is clear from the supporting documentation included in the exhibit that the withdrawals occurred on various dates between 2002 and 2015. And Hakimi maintains that it would be reasonable to assume that the

9

funds were used for community purposes even if, years later, the parties simply do not remember the details. But again, it is for the trier of fact, not this court, to decide what inferences to draw from the evidence. See Harrison v. Whitt, 40 Wn. App. 175, 178-79, 698 P.2d 87 (1985) ("Where evidence is conflicting, the trier of fact may believe the testimony of some witnesses and disbelieve the testimony of others, as well as draw from the evidence any reasonable inferences fairly deducible therefrom.").

Substantial evidence in the record supports the court's determination that an estimated $97,943 in cash was retained by Hakimi.

### Equal Allocation

Hakimi contends that the court intended to divide the property on an "approximately 50-50 basis," which corresponds to a range of "50/50 up to 52/48." Hakimi further argues that because the parties disputed the value of two properties, which were primary assets, and the court did not assign specific values to those properties, "it is not possible to determine whether the court distributed the properly equally."

But contrary to Hakimi's argument, the court's stated intent to achieve an approximately equal division of property did not limit its allocation to a particular ratio nor mean that it could allocate no more than 52 percent of the community estate to either party. But it is true that "[t]he valuation of property in a divorce case is a material fact." Greene, 97 Wn. App. at 712. A trial court must assign values to the property awarded to create a record for appellate review. Id.

10

However, remand is appropriate only where the failure to assign value to a major asset renders our review impossible.  Id.

As Hakimi acknowledges on appeal, the parties only disputed the values of the Tacoma and Snoqualmie properties.  For the Tacoma property, Oveisi assigned a value of $500,000, whereas Hakimi asserted a value of $450,000.  For the Snoqualmie property, Hakimi proposed a value of $93,800, while Oveisi argued at trial that the court should assign a value of $100,000.  Even if we assume that the court adopted Hakimi's slightly lower values for each property, the allocation to Oveisi represented approximately 55 percent of the total value parties' community property.  This can appropriately be considered an approximately equal division.  We need not reverse the trial court's final order, despite the failure to assign value, because the range of value was relatively narrow and clear from the record and the record allows us to determine that the order is otherwise equitable.

## Spousal Maintenance

Finally, Hakimi claims the trial court abused its discretion by declining to award maintenance to him in light of the parties' respective financial circumstances and prospects for future employment.

An award of spousal maintenance is within the sound discretion of the trial court and not an inherent right.  In re Marriage of Mueller, 140 Wn. App. 498, 510, 167 P.3d 568 (2007).  In ruling on a request for maintenance, the court must consider the factors listed in RCW 26.09.090(1), including:

11

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(d) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(e) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

While the trial court is required to consider each factor, the list in RCW 26.09.090(1) is nonexclusive, and the trial court is not required to make specific factual findings with regard to each factor. In re Marriage of Anthony, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019).

As an initial matter, Oveisi argues that Hakimi waived any claim of error related to maintenance because he presented no documentary evidence to support the request and otherwise failed to address the issue at trial. We disagree. Hakimi requested maintenance in his response to the petition. Relevant evidence of the parties' income, savings, retirement assets, and health condition was before the court. And both the parties and the court were aware that Hakimi was seeking maintenance. The issue was not waived.

Hakimi identifies several facts in the record that would support an award of maintenance: (1) he was 72 at the time of trial and "not employable," (2) the marriage was long-term, (3) he has chronic lung disease, (4) he has lost his housing as a result of the dissolution order, and (5) he will have to consume the assets awarded by the court to support himself, while Oveisi will not. Hakimi also argues that Oveisi could afford to pay maintenance, referencing her financial declaration admitted a trial, reporting monthly net income of more than $8,000.[6] He also asks this court to consider that his social security benefit amount will be "derivative" and lower than Oveisi's.[7]

In declining to award maintenance, the court found there was "no need" for additional support because both parties would able to "support themselves with the assets awarded." In so finding, the court expressly acknowledged the possibility that Hakimi would sell the investment properties awarded to him for income, while Oveisi planned to continue living in the family home with the parties' adult children.

While the court would not have abused its discretion in awarding maintenance in these circumstances, we cannot say the court abused its

---

[6] Oveisi testified that because of health issues and post-surgery mobility issues, it was unlikely that she would maintain her current schedule, which included a full-time position at one hospital and a per diem position at another hospital.

[7] Although Hakimi asks us to consider the differential between his and Oveisi's future social security benefit amounts, there is no evidence in the record on this point to consider. However, Oveisi's trial brief noted that Hakimi would be eligible for social security in less than a year, when Oveisi turned 62, whether or not she retired at that time. Hakimi does not appear dispute the timing of his eligibility.

discretion in failing to order it.  As the court noted elsewhere in its findings, there were no community liabilities allocated to either party and, as Oveisi points out, the court's final order awarded to Hakimi bank accounts with a value at the time of separation of over $340,000 and properties with a total value of at least $540,000.[8]  Substantial evidence in the record supports the trial court's determination that Hakimi's assets will allow him to be self-sufficient without maintenance and its denial of his request for maintenance.  In light of the property award, we conclude that the trial court did not abuse its discretion.

Affirmed.

_Smith, C.J._

WE CONCUR:

_Brennan, J._          _Mann, J._

---

[8] Oveisi testified that after she filed her petition in 2020 and up until the time of trial, the parties continued to reside in the same household and she continued to pay all of the joint household expenses.